RUFUS J. LACKLAND·et al., Trustees of Missouri Botanical Garden, Appellants, v. HERBERT S. HADLEY, Attorney-General, CITY OF ST. LOUIS and TRUSTEES OF TOWER GROVE PARK.

**In Banc, July 14, 1914.**

1. **CONVEYANCE: Subsequent Devise by Will.** The grantor in a deed cannot by his will devise any part of the estate which he did not possess after a grant of the lands described in the deed, nor can he transmit to his residuary devisees any other remedy for the enforcement of the interests and rights retained by him in the grant than he has at the time of his death.

Lackland v. Hadley.

2. ———: **Trust Estate: Alteration by Subsequent Deed.** The grantor in a deed, having conveyed certain lands to the city in fee, to be forfeited to him upon certain conditions, cannot by a subsequent deed alter the title which the donee received.

3. ———: ———: ———: **Estoppel.** The donor of land to a city, for the establishment and maintenance of a botanical garden, conveyed by deed upon conditions, to be forfeited to him for a violation thereof, estops himself, by a subsequent confirmatory deed, modifying and waiving the former conditions, from thereafter insisting upon the former conditions except so much of them as have not been waived or modified.

4. **CHARITY: Change in Administration: Title.** Power to vary the method of administering a trust, in order that its ultimate purpose may not fail, does not imply a vesting in the trustees of a title to property not given them by the trust instrument.

5. ———: ———: **Power to Administer Income: Sale of Corpus.** Henry Shaw conveyed to the city of St. Louis 276.76 acres of land, including therein a strip 200 feet wide constituting "the external boundaries with openings and passageways through the same to the park," to have and to hold the same unto the city "in absolute property in fee," upon condition that the city turn over to a park board to be named by him the proceeds of $360,000 worth of city bonds to be used in converting said land, except said 200 feet, into a park, and appropriate $25,000 annually for the maintenance of said park, the board to lease the strip of land 200 feet wide surrounding said Park, in convenient lots not to exceed 200 feet in front for any one residence, for periods of 30 years before renewal, for the purpose of erecting villa residences thereon only, and all the gross rents received from said leases without reduction were to be forever paid over to the said Shaw during his life, and after his death to the trustees of the Missouri Botanical Garden, and for a wilful violation of said leasing condition by the city the said land was to be forfeited to him or said Botanical Garden. The proceeds of the bonds were used in establishing the park, and more than a million and a half dollars have been expended by the city in its maintenance, but no part of the 200-foot rim, now estimated to be worth $816,000, has been leased for villa residences, although it has been more than forty-five years since the grant was made. The Botanical Garden seeks a decree authorizing it to sell this strip for villa residences, and appropriate the proceeds; the city asks that the title be vested in it without condition. *Held*, that the prayer of neither can be granted; and, *first*, that the instrument created a condition subsequent, which will not authorize a forfeiture

to the Botanical Garden, but at most only a covenant, for a wilful violation of which damages may be recovered in an action at law; *second*, the fundamental purpose of Mr. Shaw was the establishment of a park, and to use the outer rim of 200 feet as a peculiar method of its ornamentation, and said strip was intended to be considered a part of the park and was conveyed to the city upon condition that it should be leased and the rents applied to beautifying the adjunct thereto, namely, the Botanical Garden; and, third (opinion by GRAVES, J.), that a clear right was reserved by the instrument to compel the city to perform the imposed duty to rent the strip, which is not met by a showing of inability to lease at fanciful prices, but implies a leasing at a substantial ground rental.

*Held*, by WALKER, J., with whom WOODSON, J., concurs, that the deed did not convey the fee in the strip 200 feet wide to the city, but only as trustee for charitable uses, namely, for the establishment of an ornamental border for the park; that the deed reserved to Mr. Shaw and his assigns a beneficial interest in the strip, which by his will was transferred to the Botanical Garden, and the city holds the title of that interest as trustee for it; and, as the facts demonstrate that a conversion of the strip into villa residences under long leases has been shown to be impracticable, if not impossible, the method of administration, in order that the charitable use may not perish, may be varied, and the strip should be sold, to the city as a preferred purchaser if it desires to buy and use it for park purposes, and if the city does not choose to exercise such preference within a reasonable time, the Botanical Garden should be permitted to sell in such a way as to preserve the ornamental character of the strip originally intended.

6. **FORFEITURE:** Condition Subsequent: Covenant. A conveyance in fee simple of land to a city for charitable uses, upon condition that it be leased for villa residences and the rents paid over to the grantor during his life and after his death to a botanical garden, will not, upon a showing of a failure to comply with such condition, be held to create a right of forfeiture of such strip of land to such garden, in a suit in equity. The condition is a subsequent one, and for its non-performance there can be no forfeiture; it amounts at most to a covenant, and for its breach the beneficiary's remedy is a suit for damages.

Appeal from St. Louis City Circuit Court.—*Hon. Matt G. Reynolds*, Judge.

REVERSED AND REMANDED (*with directions*).

*Judson, Green & Henry* for appellants.

(1) The circuit court erred in construing the reservation in the deed of Mr. Shaw as a condition subsequent, which is controlled by the technical rules of law concerning such conditions. Under the language of the deed, the specific reservation of exception therein, and in view of the subsequent and explanatory deed of 1872, and the declared and lifelong purposes of Mr. Shaw with reference to the Botanical Gardens, it was clearly a reservation in trust, to be construed and enforced as such under the *cy pres* rule. The law favors reservations in trust as against conditions subsequent. Stanley v. Colt, 5 Wall. 119, quoting from Sugden, sec. 123, cited as a leading case on the subject of modifying directions for the management of a charitable trust in Lackland v. Walker, 151 Mo. 253. Baer v. Weed, 24 Pa. St. 87; Sohear v. Trinity Church, 129 Mass. 19; Tiedeman on Real Property (3 Ed.), sec. 210. (2) This fundamental principle for the construction of deeds, that wherever possible clauses are to be construed as covenants or independent agreements and as reservations in trust, and not as conditions subsequent, has been repeatedly declared by this court and is the settled law of this State. Messersmith v. Railroad, 22 Mo. 369; Clark v. Brookfield, 81 Mo. 513; Hayden v. Railroad, 222 Mo. 126; Studdard v. Wells, 120 Mo. 154; Reynolds v. Reynolds, 234 Mo. 155; 13 Cyc. 683. If the terms of the grant will admit of any other interpretation they will not be held to create an estate upon condition. Jones on Real Property, sec. 632; Invest. Co. v. Railroad, 108 Mo. 50; Weinreich v. Weinreich, 18 Mo. App. 364; Stilwell v. Railroad, 39 Mo. App. 221; Gratz v. Railway Co., 165 Mo. 211. (3) The language of the deed of 1872 is conclusive that the so-called condition in the deed of 1868 is distinctly made a reservation in trust, as by its terms Mr. Shaw expressly reserved to himself and assigns the right to

enforce the provisions of the deed by appropriate pro-
ceedings.   The opinion of this court in Lackland v.
Walker, 151 Mo. 210, declared in the broadest terms
the jurisdiction of a court of equity in the adminis-
tration of charitable trusts.   The reservation in this
case was for the benefit of the same trust declared
and enforced by this court in the case referred to.   As
to jurisdiction of court of chancery in charities, see
Visitation Convent v. Clemens, 50 Mo. 167.   (4) The
intimate association of this reservation of the strip
around Tower Grove Park with the broad and compre-
hensive purposes of Mr. Shaw in the establishment of
the Missouri Botanical Gardens, is clearly shown by
the close connection in location between the park and
the Garden.   And the reservation of a strip around
the park, in the deeds, and the direction therein that it
be leased for residence purposes, is exactly similar to
the reservation of a similar tract contiguous to the
Gardens by the terms of his will, and the direction
therein that it also be leased for residence purposes.
And it was this similar provision in the will reserving
tracts contiguous to the Gardens to be leased for villa
purposes only, which this court construed in Lackland
v. Walker.   Cases supra.   (5) It was clearly shown
by the testimony that however impracticable it was to
lease the strip for villa purposes it was entirely prac-
ticable to apply the *cy pres* rule as was done in Lack-
land v. Walker, and make sales with appropriate re-
strictions which would at once beautify the surround-
ings of the park and secure the purposes of Mr. Shaw
in the endowment of his great public charities in the
Botanical Gardens.   (6) Apart from the question of
estoppel by acquiescence we have in this case the ap-
plication of the familiar and fundamental rule that the
construction placed upon a contract by the parties
themselves must govern.   In Laclede Construction
Company v. Moss Tie Company, 185 Mo. 62, the court
said:   "Tell me what you have done under a deed

and I will tell you what that deed means.'' Bolt & Nut Mfg. Co. v. Car Co., 210 Mo. 736; Wolff v. Dyer, 95 Mo. 551; Gas Light Co. v. St. Louis, 46 Mo. 121; Patterson v. Cambden, 25 Mo. 21; Toppliffe v. Toppliffe, 122 U. S. 121. The conduct of the city and park officials in this case is conclusive that they thus understand that this reservation in trust was effective to vest the beneficial title in the plaintiffs. Carter v. Foster, 145 Mo. 383; Bollinger Co. v. McDowell, 99 Mo. 632. (7) A municipal corporation is bound by the fundamental principles invoked as to estoppel by acquiescence and by the construction of contracts through conduct as private individuals. As declared by this court, in Union Depot v. City of St. Louis, 76 Mo. 396, when a municipal corporation enters into a contract which it has authority to make, the doctrine of estoppel applies to it the same as to an individual. This principle is recognized in Stevley v. Kansas City, 179 Mo. 407. Edwards v. Kirkwood, 147 Mo. App. 616. (8) Irrespective of all other questions in the case, the circuit court erred in overruling the demurrer of plaintiffs to the cross-bill filed by the defendants, and in granting the prayer of said cross-bill in effect decreeing a forfeiture of the interest reserved by Mr. Shaw in his 200-foot strip and directing that the city of St. Louis shall hereafter hold said strip divested of any interest of the Botanical Gardens. This ruling of the court was without precedent and directly violative of the fundamental canon repeatedly declared by this court that a forfeiture will never be declared by a court of chancery. Sease v. Cleveland Co., 141 Mo. 488; Heman v. Wade, 140 Mo. 340; Moberly v. Trenton, 181 Mo. 637; Tetley v. McElmurray, 201 Mo. 382; Pomeroy's Equity (2 Ed.), secs. 459, 460; 2 Story's Eq. Jur. (13 Ed.), p. 652.

*William E. Baird* and *Truman P. Young* for respondents.

(1) The paramount purpose of Mr. Shaw, as shown by the documents in evidence, was to create a public park, known as Tower Grove Park. This park was created by deed in 1868. The Botanical Garden was created by will at the death of Mr. Shaw in 1889. We are here concerned, not with the will of Mr. Shaw relating to the Botanical Garden, but with the deeds creating Tower Grove Park. (2) A sale of the strip in question, under restrictions, is a very different thing from a thirty-year lease for villa purposes. Property given to the city as an adjunct of a public park, is intended to endure forever, and the title is intended to remain in the city as long as the city continues to own and operate the park. Restrictions upon property, when such property is sold, are in their nature temporary only. Devlin on Deeds (3 Ed.), sec. 997-C; Jackson v. Stevenson, 156 Mass. 496. (3) By the deeds of 1868 and 1872 the entire tract of land, including the 200-foot strip, was deeded to the city of St. Louis upon certain conditions, the fifth condition being that the 200-foot strip should be leased for villa purposes and the rents paid over to Henry Shaw, his heirs, and assigns. The intention was not that this 200-foot strip should be revenue producing under all circumstances, but only that it should be revenue producing in case it could be leased for villa purposes. (4) During the lifetime of Mr. Shaw he could not have applied to a court of equity, under the *cy pres* doctrine, to compel the city of St. Louis to sell this property. It is only because the plaintiffs are a charitable trust that they imagine they can invoke this power of the court. But their title is no greater than that of Mr. Shaw, and he, by leaving property to charity, could not give that charity the right to obtain from a court of equity greater title than he himself could have obtained from

260 Mo.—35

it. (5) The *cy pres* doctrine has not met with favor in the United States, and, where it is accepted, it has been given only a limited application. Pomeroy, Equity, sec. 1029; 2 Perry on Trusts, sec. 728; Jackson v. Phillips, 14 Allen, 539; Attorney-General v. Balliol College, 9 Mod. 407; Attorney-General v. Ironmongers Co., Cr. & Ph. 208; Minot v. Baker, 147 Mass. 348; Attorney-General v. Briggs, 164 Mass. 561. (6) The power of a court of equity to enter decrees *cy pres* has two aspects: First, as a prerogative power of the chancellor under the sign-manual of the king; second, as a part of the ordinary jurisdiction of the chancellor. In its latter aspect it is a power of construction and interpretation for the purpose of carrying out the main primary purpose of the creator of the charity. This latter aspect is the only aspect recognized in Missouri. Missouri Historical Society v. Academy of Science, 94 Mo. 467; Campbell v. Kansas City, 102 Mo. 326, 10 L. R. A. 593; Fontain v. Ravenel, 58 U. S. 388; Mormon Church Case, 136 U. S. 1; 6 Cyc. 961; Bispham, Principles of Equity (6 Ed.), sec. 128, p. 188; Pomeroy, Equity (3 Ed.), sec. 1027, p. 1964. (7) The *cy pres* doctrine cannot be applied in such a way as to take property from the grantee of a deed. Where the question of the title of the grantee is at issue, a court of equity cannot, under the guise of applying the *cy pres* doctrine to a trust estate, ignore this question of title and take the property from the grantee and confer it upon a third person. Adams, Equity (8 Ed.), p. 70;; St. Amaur v. Rivord, 2 Mich. 294. (8) The *cy pres* doctrine is inapplicable where a specific intent is manifested. The doctrine is only applicable where there is a general charitable intent without a specification as to the means of carrying it out, or as to who are the beneficiaries or the trustees. The doctrine as accepted by the Missouri courts, and generally throughout the United States, cannot be applied so as to set aside specific purposes clearly expressed. Bullard v.

Shirley, 153 Mass. 560; Teele v. Bishop of Derry, 168 Mass. 341; Stratton v. College, 149 Mass. 505; Attorney-General v. Boultbee, 2 Ves. Jr. 380, 2 Rev. Rep. 255; Brisco v. Jackson, 35 Ch. D. 560, 56 L. J. Ch. 540; 6 Cyc. 961. (9) The very form of the petition in this case is enough to arouse suspicion as to the right of the plaintiffs to the relief prayed for. The suit is not brought by the Attorney-General or by the alleged trustees, asking the court to exercise its power under the *cy pres* doctrine. The plaintiffs ask the court to declare that the board of commissioners of Tower Grove Park have authority to sell-the strip in question under the restrictions which they may decide upon. Such a decree would be binding upon nobody. It would be a mere declaration *ex cathedra* that the city had certain authority in regard to Tower Grove Park which it has never coveted and does not desire. The court is not asked to compel the city to make any sales. Courts of equity will not enter decrees which grant relief to nobody and are at best pure formalities. The power of a court of equity to enter decrees *cy pres* depends upon the title existing in the applicant for a decree. If he has complete title, but is embarrassed by the narrow restrictions of his power contained in the trust instrument, the power of the court to enlarge those restrictions may be resorted to; but if his title is incomplete, the power of the court can never be exercised to take title from others, or to give the applicant a larger title than that possessed by his grantor. (10.) The deed of 1868 was a common-law deed conveying to the city the land thereby described upon the conditions named. The estate created was an estate upon condition subsequent. A right of forfeiture and re-entry for condition broken is the essential mark of a condition subsequent. 2 Devlin on Deeds, sec. 974, p. 276; Tiedeman on Real Property (2 Ed.), 271; 2 Devlin on Deeds, sec. 970-D, p. 1813; Clapp v. Wilder, 176 Mass. 332, 50 L. R. A. 126. Reservations and exceptions consist

of things reserved or excepted in favor of the grantor. They cannot give rise to a forfeiture. 2 Devlin on Deeds (3 Ed.), sec. 979, p. 1830; 4 Kent's Commentaries, p. 468; Cutler v. Tufts, 3 Pick. 277. An estate upon condition subsequent is well known to the law, and a condition is a very different thing from a limitation in trust. (11) The deed of 1872 expressly waived any forfeiture on account of the breach of the condition of leasing, and provided that Mr. Shaw's only remedy for such a breach should be mandamus or other like proceeding, in case of a wilful violation. The purpose of that deed was to assure the city's continued possession of the strip, to dispel all apprehension of a possible forfeiture, and to waive all rights of the grantor, except the right to enforce a performance of the condition in case of a wilful violation. (2) The plaintiffs have no title to the property in question. The only interest which Mr. Shaw had at the time of his death was a right to receive the rents and profits, if and when the land should be leased, and that is the only interest which the plaintiffs could have now. That interest depends upon the performance of the condition for leasing. If that condition is impossible, they have no interest. St. Louis v. Ferry Co., 15 Mo. App. 234, 88 Mo. 615; 2 Washburn on Real Property (6 Ed.), sec. 946; Mizell v. Burnett, 4 Jones (N. C.), 256. (13) Condition number five of the deed of 1868, to-wit, that a 200-foot strip around the land conveyed should be leased for villa purposes, was void in its inception. (a) It was a condition which Mr. Shaw was not authorized to insert therein by the act of 1867, under which the deed was executed. The city had no power or authority under that act to receive property with a condition that it should be held and used for the benefit of Mr. Shaw. (b) By the Act of 1867, sec. 24, the land in question was exempted from taxation. This exemption could only be valid on the theory that the land became public property. The condition which subjected the land to

be rented for the private income of Mr. Shaw was inconsistent with this exemption from taxation. Constitution 1865, art. 11, sec. 16; Constitution 1875, art. 10, secs. 6 and 7; St. Louis v. Wenneker, 145 Mo. 230; G. S. 1865, secs. 1 and 2, p. 95; Gray on Limitations of Taxing Power, secs. 1346 and 1349. (c) The condition was further void as a violation of · the rule against perpetuities. It attempted to secure to Mr. Shaw and his heirs the right to receive the rents and profits from this land in perpetuity, and was therefore obviously void. Gray on Perpetuities, p. 340, sec. 410-A; Bigelow v. Cady, 171 Ill. 229; Williams v. Herrick, 19 R. I. 197; McGrath on *Cy Pres,* secs. 9 and 17. The condition in favor of Shaw in his lifetime being void, an absolute grant in fee remains in full force free of the condition. The void condition could not be subsequently validated by a will leaving the residue of Shaw's estate to charity. Hopkins v. Grimshaw, 165 U. S. 342; Slade v. Patten, 68 Me. 380; Tiedeman on Real Property (2 Ed.), sec. 544. (14) The condition for the leasing of the land in question was impossible at the time of the execution of the deed of 1868, and has been impossible ever since, as is conceded in the pleadings and the testimony. The estate, therefore, in the city, is absolute and freed of this condition. Coke on Littleton, 206-A; Washburn on Real Property (6 Ed.), 943; Tiedeman on Real Property, secs. 273 and 274 (note 3); Clark v. Brookfield, 81 Mo. 509; Hughes v. Edwards, 9 Wheat. 492; United States v. Arredonda, 6 Peters, 745; Board of Comm. v. Young, 59 Fed. 107; Parker v. Parker, 123 Mass. 584; 6 Am. & Eng. Ency. Law (2 Ed.), p. 506; Merrill v. Emory, 10 Pick. 511; Bullard· v. Shirley, 153 Mass. 559; Adams v. Lindell, 5 Mo. App. 209, 72 Mo. 198.

## STATEMENT.

The board of trustees of the Missouri Botanical Garden created by the will of Henry Shaw, which was probated on the 21st day of September, 1889, brought this suit in equity to procure a decree declaring a trust for their benefit in a strip of land 200 feet wide, which, and other lands surrounded by it, was conveyed by Henry Shaw, in pursuance of an act of the Legislature (March 9, 1867, Laws 1867, p. 172) for the establishment of Tower Grove Park, to the city of St. Louis, by his deed of October 20, 1868, and a grant in confirmation, July 9, 1872. Said act of the General Assembly provided for the government of said park, a board of commissioners consisting of from five to seven persons, of which board Mr. Henry Shaw was to be a member during his life, with the power of appointment of all other members. Said act gave the board power to prescribe rules and pass ordinances for the regulation of the park, and made a violation of such ordinances a misdemeanor. It required the city of St. Louis to issue and sell bonds aggregating $360,000, whose proceeds should be paid over to said board and applied by it to the improvement and administration of the park. It further required the city of St. Louis to provide by general taxation an annual maintenance fund of $25,000, to begin three years after the passage of the act. And it exempted all the land conveyed by Mr. Shaw in pursuance of its provisions, from every form of taxation and provided that such lands should be held in fee by the said city of St. Louis, and authorized said city to issue bonds for $50,000 for the purchase of certain adjoining lands, if needful.

Henry Shaw executed an indenture with the mayor of the city of St. Louis, October 20, 1868, whereby he conveyed to it the lands by the same description given to them in the act of the Legislature, and the city assumed the covenants required of it by said act. Said

indenture conveyed 276.76 acres, and located on this tract an outer rim of 200 feet wide, with openings or passageways to the inner park (as shown on a plat of the whole tract conveyed which accompanied the deed and was made a part thereof) for leasing "upon long leases for villa residences, which should be an ornament to the park and·source of revenue." . The deed then vested the whole tract, to-wit: To have and to hold the same unto the said city of St. Louis in absolute property in fee so long as said city shall conform and comply with the following conditions annexed to said grant, to-wit: First, that all of said tract of land hereby conveyed except the aforesaid strip two hundred feet in width, shall be and remain and be used and managed as a public park for the health, well-being and enjoyment of the citizens of said city and county of St. Louis, forever. That no portion of said park shall ever be used for any other purposes than those appertaining properly to such public park nor shall any revenue ever be raised from the use of any portion of said park except such as may be consistent with its said purpose and use and which revenue shall go to the maintenance of said park through the board of commissioners.

Second, that the city of St. Louis shall within —— months from the date hereof pay over the proceeds of. the bonds of the city of St. Louis authorized to be issued to the board of "the Commissioners of the Tower Grove Park" as mentioned and authorized to be formed by the second and third sections of said act which said board as authorized by said act shall be composed of the said Shaw, and of the following persons by him now selected and named therefor, to-wit: Adolphus Meier, Wm. F. Ferguson, Charles P. Chouteau and James S. Thomas.

Third, that after the money so raised by the sale of said bonds shall have been expended in the laying out and embellishing and constructing said park there

shall be expended each year the sum of twenty-five thousand dollars in special funds, for the keeping up, maintaining and improving the said park. Fourth, that the provisions of said act as to construction, appointment and the filling of vacancies in the board of commissioners of said park shall forever remain inviolate. Fifth, that the board of commissioners of the Tower Grove Park shall from time to time cause to be leased the said strip of land 200 feet in width so surrounding said park in convenient lots not to exceed 200 feet in front, nor less than 100 feet in front to any one person for periods of thirty years, before renewal, for the purpose of erecting villa residences thereon only, and all the gross rents received from said leases without deduction shall be forever paid over to said Henry Shaw and to his heirs, executors, administrators and assigns so that he and they shall forever enjoy said rents and the city shall execute the proper leases therefor which shall contain a clause that there shall be only one residence on each tract so leased. And whereas by said act of the General Assembly the city of St. Louis was authorized to purchase land adjoining the property hereby conveyed to form part of Tower Grove Park, it is hereby understood and expressly agreed that if said city shall hereafter purchase for the aforesaid purpose the parcel of land owned by the heirs of the late Thomas Jefferson Payne, bounded west by the King's highway and north by Magnolia avenue as intended to be extended in a right line to the King's highway, the said strip of land of two hundred feet in width hereinbefore mentioned as far as the same may adjoin said land of said Payne shall be used for said park and a like strip of land to be taken from said land purchased as aforesaid from said Payne shall be substituted therefor for said leasing purposes, so that the said strip of two hundred feet in width to be leased as aforesaid shall surround said Tower Grove Park, so extended in the northwestern corner thereof. It is here-

by expressly provided that this conveyance is made upon the express condition that if said conditions upon which said conveyance is made or any of them shall be violated in the lifetime of said Henry Shaw, the said property and all the improvements thereon shall at once revert to said Shaw, and absolutely vest in him in fee as if the conveyance had not been made, and if said conditions or any of them shall be violated after the death of said Shaw, then the said estate hereby conveyed and all improvements thereon shall go to and be vested in whomsoever said Shaw may appoint for the use of the Missouri Botanical Garden, or directly in said Garden whenever the same is incorporated or authorized by law to hold directly in its own name and for its own use. The said party of the second part hereby covenants to and with the said party of the first part that they will perform and fulfill the conditions and agreements hereinbefore mentioned.

"(Seal) In testimony whereof the said party of the first part has hereunto set his hand and seal and said party of the second part has caused the same to be signed by its mayor and countersigned by its register and its corporate seal to be hereto attached the day and year first aforesaid.

"Henry Shaw (Seal)
"James S. Thomas, Mayor.

"Attest: I. W. Heath, City Register."

The supplemental deed is to-wit:

"Whereas Henry Shaw of the city of St. Louis did convey by deed dated 20th October, 1868, and recorded in the recorder's office of St. Louis county in book 370, page 421, to the city of St. Louis a certain tract of land containing two hundred and seventy-six and 76-100 acres of which tract two hundred and two and 2-100 acres were donated for a public park and the gates and approaches thereto and seventy-four and 74-100 acres were by said city of St. Louis to be leased by said city through the Board of Commissioners of

said Tower Grove Park and the revenues derived there-
from to be paid over to said Shaw or assigns as will
more fully and at large appear by reference to the
provisions of said deed, and whereas it was provided by
the terms of said conveyance that such conveyance
was made upon the express condition that the said
city of St. Louis *should hold* said property *so long as
said city should comply with the conditions annexed to
the grant* thereby made and then upon the *violations*
of said condition or any of them the property should
at once *revert* to said Shaw or whomsoever he might ap-
point, and whereas the condition in respect to the leas-
ing of said seventy-four and 74-100 acres (being a strip
of two hundred feet in width surrounding the park)
and paying to said Shaw the revenue is liable to dif-
ferent interpretations as to unperformance thereof and
the dependence of the grant so far as the two hundred
and two and 2-100 acres granted by said Tower Grove
Park and its approaches are concerned is deemed on-
erous by said city. Now therefore the said Henry
Shaw does hereby covenant and agree to and with the
said city of St. Louis, that the *nonperformance* by the
city of St. Louis of the *conditions,* covenants and agree-
ments on the part of the city in relation to said seventy-
four and 74-100 acres *shall not work any forfeiture* of
the grant so made to the city of St. Louis of the two
hundred and two and 2-100 acres set apart and desig-
nated as Tower Grove Park in said deed and the plat
annexed thereto the said Shaw expressly *reserving* to
himself and assigns the full and perfect right at all
times upon any *wilful violation* on the part of the city
or said commissioners to lease the said seventy-four
and 74-100 acres from time to time as provided in said
conveyance and pay the rents to him or to whomso-
ever he may appoint to enforce the performance of the
agreement for and concerning the said leasing or pay-
ment of net rents and revenues therefrom to said Shaw
or assigns by writ of mandamus or other appropriate

remedy against the city of St. Louis or said commissioners the said. Shaw hereby in no manner modifying, changing or impairing the *conditions* of said grant in this particular so far as the 74 and 74-100 acres are concerned. And whereas also it is desired by said city that the *conditions* of said grant that the said city and county of St. Louis shall each year appropriate the sum of twenty-five thousand dollars in gold for the keeping up, maintaining and improving said park, shall be made more definite and specific, being the third *condition* specified in said deed, therefore the said Shaw does hereby covenant and agree to and with the said city of St. Louis that no forfeiture of the said Tower Grove Park and its approaches of two hundred and two and 2-100 acres no *right of re-entry* upon said park shall accrue to or be enforceable by said Shaw, his heirs or assigns unless upon the wilful neglect or default of said city to make such yearly appropriation and not unless the said Shaw, his heirs or assigns, shall have notified in writing said city that he or they claim said *forfeiture and right of re-entry* by virtue of such neglect or default on the part of said city and one year after said notification shall have expired without any such appropriation having been made. Nothing hereby contained shall be considered in any way as qualifying, impairing or controlling the right of said commissioners of Tower Grove Park to demand and have from said city from and after the period stipulated in said deed the yearly sum of twenty-five thousand dollars as provided therein or the right of said Shaw, his heirs or assigns or said commissioners to enforce the payment of the same by appropriate remedies if they select. Said Shaw hereby admits the performance on the part of the said city of St. Louis of the condition annexed to said grant being the payment by the city of St. Louis to said commissioners of the proceeds of bonds of the city of St. Louis authorized to be issued

ing said park. This agreement is not to be considered and taken as in any way modifying, controlling or affecting the provisions and conditions in said deed contained except as to the matters and to the extent and degree herein mentioned but the same remain in full force entirely unaffected by anything herein contained. The said Henry Shaw for and in consideration of one dollar to him paid by the city of St. Louis does hereby remise, release, quitclaim and convey to the city of St. Louis for the purposes of Tower Grove Park, and as a part thereof a certain lot of ground containing two hundred feet from north to south by one hundred feet from east to west, and being the eastern one hundred feet of said strip of two hundred feet surrounding the park. Commencing at the Tower Grove Gate as represented on the plat annexed to said deed and running east one hundred feet, being the same lot of ground on which the superintendent's house and office of said park are placed to have and to hold the same unto the said city in absolute property in fee upon the same terms and conditions as they now hold said Tower Grove Park and so long as the said city shall comply therewith. In witness whereof the said Henry Shaw has hereunto set his hand and seal this 9th day of July, 1872. "HENRY SHAW. (Seal)"

In their petition plaintiffs claim to be the residuary devisees of Henry Shaw, and as such entitled to whatever interests were reserved by him in the execution of the foregoing deeds. They aver that the method which he prescribed for obtaining a source of revenue by requiring the city to lease for villa residences on long terms, the outer 200 feet of the land conveyed to it, has "proven impossible of realization." Wherefore defendants did not wilfully or intentionally neglect to make such leases.

The prayer of plaintiff's petition was for a sale in lots of convenient size of the two hundred feet form-

ing the external boundaries of the land conveyed by Mr. Shaw to the city of St. Louis, and that "the net proceeds of such sales should be paid to plaintiffs for the use of the Missouri Botanical Gardens." The prayer also asks for power in the Board of Commissioners to "sell or lease the lands . . . to the city of St. Louis . . . and for further relief."

The answer of the defendants, who were the then Attorney-General and the board of Commissioners of Tower Grove Park, admitted so much of the deeds and records as was set forth in plaintiffs' petition, denied that plaintiffs had any interest whatever in the lands sought to be subjected, and prayed for cross-relief, adjudging the full title of the land be in the city of St. Louis; admitted the statement or allegation in plaintiffs' petition that it was impossible to rent the strip of land in dispute for villa residences or collect any rent from such leases.

The evidence shows that rentals to an inconsiderable amount have been collected by the board of commissioners of the park from temporary tenants of such strip, who used it for gardening purposes; that Henry Shaw, from the time of the establishment of said park and for twenty-one years thereafter, was continuously a member of the board of park commissioners provided for by the act and created in accordance with the terms of his deed to the city of St. Louis, and that he selected all of the other members of said board, and that the entire management of the park was intrusted to it; that the board has continued the same, except that since his death he has been succeeded by the director of a quasi-public charity, the Missouri Botanical Garden, which was first established by the provisions of his will. This latter charity was before the court, and its specific nature and the powers and the duties of the trustees to whom Mr. Shaw had conveyed in fee the bulk of his estate, were fully defined in Lackland v. Walker, 151 Mo. 210. For the promotion and maintenance of

this charitable trust created by his will, Mr. Shaw conveyed to the fifteen trustees named therein the bulk of his real estate now shown to be of the value of between five and six millions of dollars. In the management of their trust said trustees, according to a report of their receipts and disbursements for the year 1907, received $178,091.36, and expended $171,074.26, leaving a balance on hand of $7017.10. The residuary clause of Mr. Shaw's will, under which plaintiffs claim, is, to-wit: ''Also all the residue of my estate real and personal or mixed, which I may leave, or be possessed of at the time of my death, which shall not have been in this my will devised, bequeathed, and disposed of, I devise and bequeath to said trustees. To have and to hold to them and the survivors of them, and their successors in said trust forever upon the said uses and trusts above mentioned.''

In the first paragraph of the will of Henry Shaw, where there was a general devise of his real estate to the trustees of the Botanical Garden, a clause is contained which excepts from said general devise the lands in dispute in this case, in the following terms: ''excepting such interests and estates as I have heretofore conveyed to the city of St. Louis, by two deeds, one bearing date the twentieth day of October 1868, (2) and the other bearing date the ninth of July, 1872, and do therein devise to the said city of St. Louis for Tower Grove Park.''

The evidence shows that in consideration of the conveyance to it of the land for park purposes, the said city of St. Louis sold its bonds and devoted their proceeds, amounting to $360,000 to the improvement of the grounds, and three years thereafter and continuously up to the present time, has applied $25,000 of money raised by taxation to the annual maintenance of said park, and that as provided in the act of the Legislature authorizing the conveyance of this property by Mr.

by law for the laying out, constructing and embellish-Shaw, the entire property has been exempted from every form of taxation.

The evidence further shows, as admitted in the pleadings, that the city has not leased any of the strip for villa purposes, but has been able to receive a slight rental therefor from persons using it temporarily, which it paid over to the plaintiffs as the assignees of Mr. Shaw under the residuary clause of his will. The evidence further shows that if the strip of land in question were now sold it would have a probable market value of $816,250. Upon the consideration of the pleadings and the facts, the trial court rendered a decree adjudging complete title in the defendants as prayed for in their cross-bill, and dismissed appellants' petition, from which judgment this appeal was taken.

## OPINION.

### I.

BOND, J. (after stating the facts as above).—It is perfectly clear that the only question on this appeal is the interest of Henry Shaw, and the proper enforcement thereof under the terms of his two deeds whereby the property including the outer rim or strip of 200 feet was vested *in fee* in the city for the purposes and upon the conditions expressed in the deeds. It cannot be that Mr. Shaw by his will could devise any particle of the estate which he did not possess after his grant of the lands in question, nor could he transmit to his residuary devisees, the plaintiffs, any other remedy for the enforcement of the interests and rights retained by him than he had at the time of his death. With this in mind, the only thing left in this case is to determine from the language of the two instruments what interest or estate passed to the grantees, or was reserved to the grantor. The meaning of these words is not aided or helped by the conclusion reached by

this court when it conceded the power of the trustees to whom a great estate had been conveyed in furtherance of a different charity described in the last will of Henry Shaw to vary the details of its administration, for that case (151 Mo. 210) presented only the question of the power of the trustees who held a *fee simple title* for the sustention of a charity, to vary their administration from a method of substantial sale by a leasing with a covenant for perpetual renewal, to a sale outright to meet the necessities of a definitely created and established charity. This the court permitted them to do in order to prevent the frustration of the paramount purpose of the donor. Mr. Shaw, a childless and wifeless man, was a lover of flowers, and had devoted much of his life to their cultivation, and had laid out on his residence grounds a botanical garden and constructed a library and museum thereon. This and the remainder of his vast estate was devised by him to the trustees named in his will for the perpetual maintenance of a botanical garden, accessible to the public under the restrictions contained in his will. In its ruling upon the case then presented (151 Mo. 210), the court held that the title-holding trustees, who were directed in the will to lease the real estate conveyed to them for a term of sixty years, with a covenant for perpetual renewal, were entitled, upon the impossibility of effecting such leases, to make an alienation of the property for the support of the charity. That ruling merely gave the power to vary the method of administration of the trust, but not to alter the purposes or objects of the charity, nor to change its character as created by its founder. But in the instant case the plaintiffs are not asking to be allowed to sell any real estate conveyed to them on account of the impossibility of the performance of any duty with which they have been charged in respect to it, for this real estate was conveyed *not* to plaintiffs, but to another trustee, who, and not plaintiffs, was

charged in the deed devoting it to a wholly different charity, with the duty to lease it for a particular purpose—ornamental to the park—and pay the rent realized in that mode only to a grantor of whom the plaintiffs are merely the assignees. The plaintiffs in this case occupied no such status as they did in that case. There they desired to convey the fee *vested* in them, to subserve a charity which was richly endowed but hampered in the use of its property. Here, the defendant city is the trustee of a public charity wholly disconnected with the other, of which it is the conjoint founder with the donor of the land (for it made it a park by paying $360,000 to improve it and appropriates $25,000 annually for its maintenance) and since it has turned out that defendant cannot rent for a special purpose which would enable plaintiffs, as assignees, to secure the rent thus collected, they are seeking to cause defendants to sell the property and give them the total proceeds estimated at $816,000, if the fee is sold. In other words, in the case cited plaintiffs sought to be granted, in the performance of their duties as trustees, the right to vary in the matter of administration, a trust of property to which they had *title*. Here they are seeking to obtain property to which another trustee *holds* the title, for another charity, although they admit such other trustee, holding the title for a definite charitable and public trust, has without fault been unable to find tenants for a special leasing required by its charitable appropriation and pay the rent to plaintiffs as assignees of the grantor, Henry Shaw. Here, plaintiffs seek to *obtain* a title or its proceeds, which was not given to them. In the case cited they sought to dispose of an asset which belonged to them, and the full title to which was vested in them. It is evident that the decision in Lackland v. Walker, supra, bears no analogy to the case in hand and sheds no light on the meaning of the words contained in the two instruments

260 Mo.—36

under. consideration. We, therefore, will look to the instruments themselves to ascertain their legal import.

II. What Mr. Shaw and the city of St. Louis designed to do, under the authority of the State, was the establishment of a park for the common benefit of the public, a proper civic motive on the part of the city, and a philanthropic benefaction by Mr. Shaw. This is demonstrated by the fact that the precaution (though unnecessary) was taken to apply to the Legislature for an act establishing and naming the park, *describing* the lands to be conveyed, providing a board of control and management, authorizing the city to expend immediately and subsequently the sums mentioned in the act, exempting the entire property from any burdens of taxation, and providing further that "*it shall be held in fee by the city.*" In pursuance of this act Mr. Shaw executed his deed of indenture to the city, conveying to it the lands by the *same* description contained in the enabling act, and imposed, among others, a condition that 200 feet in width on the outer portion of said lands should be leased by the city in specified lots, on terms of thirty years before renewal, for the purpose of villa residences, and the city should pay over the rents for such leasing "forever to Henry Shaw and his heirs, executors, administrators and assigns." The indenture then provides that if *any* of said conditions are broken in the lifetime of Shaw "the said property and all its improvements thereon shall at once revert to said Shaw and absolutely vest in him in fee as if the conveyance had not been made;" but if violated after his death then a similar reverter should take place to an appointee of Shaw for the use of the Botanical Garden, or to it if then incorporated. It is not necessary to consider any of the other conditions upon which the fee was vested in the city, except the ones above quoted relating to the leasing of the strip by the board of commissioners, for all the others have been fully

performed. The one in question moreover has been expressly and specially restricted by the deed poll made by Mr. Shaw three years after the execution of his indenture with the city to a *"willful* violation'' by the city or said commissioners of the requirement to lease said strip for villa residences and pay the rents to him or whomsoever he may appoint. The grantor in said deed also expressly reserved the right to enforce that condition as to leasing by mandamus or other appropriate remedy. This partial waiver and modification of the conditions in question by Mr. Shaw is an absolute estoppel by deed as against him or his assigns, the plaintiffs. Such was the purpose and effect of his confirmatory deed. It was executed to relax the stringency of the condition of forfeiture which had been inserted in the prior deed of indenture between the city and Mr. Shaw. It was clearly out of the power of Mr. Shaw by his subsequent confirmatory deed, nor did he attempt so to do, to alter the title which the city got under the prior deed. He might and did modify his right to invoke a breach of the condition of his former deed, but he could not change the character of the title previously vested in the city.

What then was the title under the first conveyance? That instrument by its terms and as the sequence of the enabling act, shows that it was framed to perpetuate a public charity in the form of a designated park. This was the primary and paramount purpose of Henry Shaw, to achieve which he gave the State Legislature the exact boundary of the land which he intended to donate, and obtained authority from it for the city to take such lands and provide at its expense for their improvement and maintenance, and to hold them in fee simple title and free from any form of taxation for the charitable purposes described. As the giver of the soil for park purposes Mr. Shaw felt entitled to have a voice in its control and management. This he secured by a life membership on its board of commissioners,

and the appointment by himself of all other members. He desired to impress his personal views in the improvement of a part of the land—its outer border of 200 feet. This he designed to be an ornament to the park by being made the site of villa residences. He required the board of commissioners, composed of himself and his appointees, to make leases for such edifices at thirty years before renewal, and provided that the rents thus derived shôuld be paid to himself or his assigns. His controlling object was the establishment of the park, whose government was retained in his hands. He believed that a most artistic effect would be added to the general plan of the park if it should have a border of picturesque residences with ''passageways through leading to the inner park grounds.'' His idea was that this would enhance the beauty of the approaches to the park which he evidently beheld with the ''prophetic eye of taste'' as a scene of driveways, walks, fountains, rare forestry, temples, pools, grass plots, playgrounds, all encircled with embowered villas and winding entrances. The thought dominating his mind was the effect of a colorful and exquisite border as an *adjunct* to that park, to establish which he had invoked the power of the State and the financial aid of the city and its services as the holder of the title in fee of the land donated to this great public charity. From a reading of the act and the deeds under which this charity was created, it cannot be imagined that Mr. Shaw had any other motive in reserving to himself and his assigns the rent for the villas than to dispose of an incidental revenue derived from an ornamentation of a part of the grounds which he conveyed to the trustee for the public park. He was not concerned about adding to his private fortune. He was a philanthropist, not a miser. What engrossed his mind was the project of beautifying the park by entrances to its inner drives and courses through a picturesque setting in harmony with the flowers and for-

estry within. He designed the park and its surround ings to present the view of a single landscape. Had he desired money out of this property he would not have conveyed it to the *trustees* of the park, but would have reserved it to himself to be devoted to trade or utilitarian uses. That he parted with the titles to carry out his purpose to make this strip an *auxiliary* to the park is also shown by his conduct. For over twenty years he managed and ruled the park through its board. During that period he never sought in any way to disturb the conveyances which he made to this land, though he knew no leasing had been made of it and no rents paid over to him, for the duty to do this was cast upon himself.

To put the matter at rest he expressly covenanted that no forfeiture should arise as to this condition except for "willful violation."

To our minds it is patently plain that the first and fundmental purpose of Henry Shaw was the creation of a park; that in pursuance of that controlling object he desired to improve the outer rim of the lands deeded to the park in a particular suggested by his own taste, and which he thought would embellish the park. His charity in this instance was the park. His method of furthering it by an ornamental border was a mere suggestion of his own fancy, which if impossible of accomplishment he did not intend to be used as an instrument to despoil a beneficent public charity of which he was a co-founder, and which expressed his primary purposes.

### III.

The language of his deed of gift conditioning the continuance of the estate upon a future compliance with certain conditions, including the one as to leasing this strip, brings that requirement directly within the definition of a condition subsequent. Such a condition if it has any effect, defeats a vested estate. The rule for determining a condition subsequent is thus ex-

pressed by a standard authority: "If the act or condition required does not necessarily precede the vesting of the estate, but may accompany or follow it, and if the act may as well be done after as before the vesting of the estate, or if from the nature of the act to be performed, and the time required for its performance, it is evidently the intention of the parties that the estate shall vest, and the grantee perform the act after taking possession, then the condition is subsequent." [2 Washburn on Real Property (6 Ed.), sec. 941, p. 7.]

The habendum clause of the indenture referring to this and other conditions is, to-wit: "To have and to hold the same unto the said city of St. Louis in absolute property in fee so long as the said city shall conform and comply with the following conditions annexed to said grant, to-wit." If anything could add to the certainty and definiteness of the foregoing language, it is comprised in the following provision of the deed with reference to the breach of any of the conditions upon which the property was conveyed, to-wit: "It is hereby expressly provided and this conveyance is made upon the express condition that if said conditions upon which said conveyance is made or any of them shall be violated in the lifetime of said Henry Shaw, the said property and all improvements thereon *shall at once revert* to said Shaw, and absolutely vest in him in fee as if the conveyance had not been made and if said conditions or any of them shall be violated after the death of said Shaw, then the said estate hereby conveyed and all improvements therein shall go to and be vested in whomsoever said Shaw may appoint for the use of the Missouri Botanical Garden or directly in said Garden whenever the said is incorporated as authorized by law."

The foregoing clauses of the deed show that the estate was fully vested when the deed was made, and provide that it shall remain vested *"so long"* as certain conditions of a nature which could not be per-

formed until after the vesting of the estate is observed. It further provides for a *future reverter* of the property. This language of the deed contains every element necessary to create a condition subsequent, and cannot be distinguished therefrom under the definition above quoted. While legal exactitude postulates that the condition as to the leasing of the strip is simply a condition subsequent, and, therefore, neither Henry Shaw nor his heirs could take advantage, except by a re-entry or equivalent acts, for a breach, yet plaintiffs would be in no better position if we were able to construe the deed to have simply created a covenant to pay rent received for a specified renting, to Mr. Shaw, which was assigned to them. The reason is that if the requirement as to paying the rent received for villa residences is not à *condition* of the *continuance* of the estate in the grantee, then it cannot trench upon that estate and the present action is wholly misconceived. This suit is necessarily predicated upon the theory that the title to the strip sought to be sold is in equity vested in the plaintiffs, who are asking for the proceeds of its sale. But no title whatever could accrue to plaintiffs if the clause in question was simply a collateral covenant or obligation assumed on the part of the city. For on that hypothesis, its nonperformance could not affect the title conveyed, but would simply furnish a basis for an action for damages at law. A covenant to pay rent to Mr. Shaw or his assigns for a specified use of the property, whether observed or not observed, could have no relation whatever to the title conveyed for charitable purposes. It might involve a question of liability, but it could not in the nature of things, disturb the title vested in the trustee, nor defeat the charitable purpose for which it was granted and held for the trustee. Taking either of the horns of the dilemma that the language under review, of the donating deed, created either a condition subsequent (which we think it did) or that it created only an obligation on the title holder (the

city) to pay the rent which it might receive from this prescribed method of leasing, and the result is, equally inescapable that plaintiffs are not entitled to enforce either the condition or the covenant, since there has been no *willful* refusal either to lease the property or to pay the rent, and that is the test which Mr. Shaw fixed as the standard of obligation on the part of the city.

Our conclusion is that whether the provision as to leasing this strip was a condition subsequent or a mere covenant or agreement on the part of the trustee, in either event no redress can be granted in the present action, it not being claimed that defendants have *"willfully"* refrained from renting the property for villa purposes and paying over its proceeds, and that being the only ground on which plaintiff would have a shadow of right to sue defendants either at law or in equity.

## IV.

The error which runs through all the contentions of appellants is that they seemingly overlook the real nature of their relations to the property which they seek to sell or sequester. When their assignor, Mr. Shaw, reserved a right in himself and his assigns to the incidental earnings of a part of the land donated by him to the trustee for a public park, he did not thereby detract one whit from the title which he had vested in the trustee for the public charity. He merely said to this trustee in effect: "Make a part of the property held by you for the public park an ornamental inclosure, with inlets and outlets to the recreation grounds of the park. Whatever rent you collect by following my directions as to the improvements of this beautifying border, you will pay to me or my assigns." In so stating in substance, Mr. Shaw would be addressing himself, for he was the head and the selector of the executive board of the park, and charged with the duty of its entire government, and specially charged with

the duty as to making such leases of the ornamental rim of the land given by him to the park. He did not during his whole life, perform that requirement. And, as has been shown, three years after assuming the management of the park, by his solemn deed he released the city as trustee of the land, from any obligation arising out of this clause of his deed, except a *"willful"* refusal, and reserved to himself only the right to resort to mandamus or other appropriate remedy to enforce action as to the leasing, if he so desired. Upon his death, appellants as his assignees became entitled only to enforce this requirement in the method to which he had restricted it, and by the means which he had fixed in his lifetime. The misconception of appellants is as to the nature of the interest transmitted to them. It was at most a mere succession to the rights of contract which existed between the city and Mr. Shaw under the two deeds executed by him. The rights thus devolved by Mr. Shaw were not greater by being assigned to the appellants, than if he had given them to a faithful servant or a personal friend. The fortuitous fact that appellants happened to be the *trustees of the title* to the bulk of Mr. Shaw's estate for the use of another charity prompted by his aesthetic nature and disposition, gave them no higher right as assignee of the asset sought to be reached in this suit, than any individual would have had to whom Mr. Shaw might have made a similar assignment. If Mr. Shaw in his lifetime had filed a petition seeking, as in this case, to *forfeit* the title in the city and to sell this part of the land which had been contributed by him to this public park, and on the faith of which the State exempted every portion of it from taxation, and the city expended up to the present time about a million and half dollars in development and in maintenance, would he not have assumed in so doing an attitude beyond the scope of any equitable relief, in view of the terms of his grant and its acceptance, and his *own* conduct in refraining from mak-

ing any such leases or attempting to make any, coupled with a statement in such a petition that it was impossible to make them? We think the question answers itself, and that it cannot be seriously urged that a court of equity would, upon such a showing, virtually decree a *forfeiture* of the title to a part of the land conveyed by him in carrying out his object of creating a public charity for the common benefit of the people of the city, and at such costs to them.

In a suit in equity brought to recover title to property conveyed on condition to support the grantor, which was not complied with during the lifetime of the grantee, this court said: "The answer to this is, that a court of equity never lends its aid to enforce forfeiture under any circumstances (Livingston v. Tompkins, 4 Johns. Chan. 415); and as we cannot consider this a proceeding at law to recover the possession of the land upon the legal title that would have reverted to the plaintiff upon an entry for the breach of the condition, the judgment must be reversed and the petition dismissed." [Messersmith v. Messersmith, 22 Mo. l. c. 372.] That doctrine has never been departed from in this State (Sease v. Cleveland Foundry Co., 141 Mo. l. c. 496; Moberly v. Trenton, 181 Mo. l. c. 646; 1 Pomeroy's Equity [2 Ed.], secs. 459, 460; 2 Story's Equity [13 Ed.], p. 652), and furnishes the correct solution of the question raised on this appeal. For however disguised, whether by terming the claim made by appellants a covenant or reservation in trust, it necessarily means one and the same thing, that they are seeking to cancel the conveyances of their assignor of the *fee simple title* to the property in question subject to charitable uses, in order to obtain for themselves the "net proceeds" of the sale of the property by "*authority*" of a decree of this court. To that relief they are not entitled, either under the pleadings or evidence contained in this record, nor would their petition have survived a general demurrer.

## V.

Before disposing of this appeal we will consider the cases cited by appellants.

Clarke v. Inhabitants of the Town of Brookfield, 81 Mo. 1. c. 509, cited in appellants' brief, simply reaffirms the rule that an illegal condition or one made impossible by inevitable accident, *or by the act of the grantor*, will be held void, and no reverter of the estate of the grantee can take place for the nonperformance of valid conditions. That doctrine cannot be invoked by appellants for two reasons: First, none of the conditions of this deed have been violated, there being no willful default by defendants; secondly, equity may for good reasons *relieve* against forfeitures, it does not enforce them. Moreover, if there was a failure for twenty-one years to comply with this requirement, it was *caused* by the nonaction of the *grantor* in the deed himself.

In Studdard v. Wells, 120 Mo. 25, Judge BLACK, speaking for the court, correctly held that when the language of a deed relied upon to create a condition subsequent did not in express terms or by clear implication show the intention of the parties to create such a condition, it would be held to be only a covenant between the parties, the reason given by him being that otherwise a vested estate would be defeated, which was against the policy of the law if it could be avoided by any reasonable construction of the terms of the grant. That case is conclusive against the right of appellants to recover in this suit for it distinctly shows that the reason the courts are adverse to upholding a condition subsequent is that it will have the effect, if upheld, of divesting the title of a grantee, whereas a covenant does not. If, therefore, by any stretch of construction (which we do not concede) the clause of the deed relating to the payment to Shaw, or his assigns, of rents collected on villa leasings could be held to be only a contract obligation, or anything else less than a condition subsequent, it would for that very reason

have *no effect* upon the title of the grantee in the deed, which would be wholly undisturbed either by its performance or nonperformance, and appellants would be relegated to another action if they could show any breach of such covenant. And this is precisely what was done in a suit brought to forfeit the title of a grantee and annul the deed to him for an alleged breach of covenant which it was claimed was the cause of the deed. After reviewing the cases and pointing out the distinction *arguendo* between conditions subsequent, which would uproot a vested title, and covenants or other obligations between the parties, which would not have that effect, it was ruled that the deed then before the court disclosed that the clause relied upon to defeat it was merely a covenant. Wherefore, this court dismissed the suit in equity for the reason that it was not the proper forum for the recovery of damages for the nonperformance of a covenant and that a breach of a mere covenant, even if it went to the whole deed, did not annul it. [Haydon v. Railroad, 222 Mo. l. c. 145.] That no suit can be maintained in equity to set aside a deed for breaches of an independent covenant for which it was given, is the settled law, and was also ruled in Anderson v. Gaines, 156 Mo. l. c. 670, 671.

Under these authorities, appellants have no standing in a court of equity under the allegations of their pleadings, and the evidence adduced on the trial. Whether any ground for mandamus, or other appropriate remedy reserved by the grantor, exists now or may arise hereafter in favor of appellants as his assigns, does not appear in the present case, and will not be prejudged by our conclusion herein, which is that the judgment of the circuit court is too broad in its terms in that it should not have passed on any issue in the present action which might have arisen in other proceedings. It will, therefore, be reversed and the cause remanded with directions to dismiss appellants' peti-

tion. All concur; *Graves, J.*, in separate opinion in which all concur except *Walker* and *Woodson, JJ.*, who dissent in a separate opinion, by *Walker, J.*

## CONCURRING OPINION.

GRAVES, J.—If I understand fully my brother Bond's opinion he reaches the right result. I believe that his views are my views, but for fear that his very concise way of stating things may not fully present my ideas I add a few words. I believe that the fee simple title to this 200-foot rim is in the city of St. Louis. By the first deed made there might have been broad rights reserved to Mr. Shaw and his assignees. By the second deed this first deed in this respect was shorn of much of its apparent potency, but whether this "shearing" touches the rim tract might be a question. But to my mind there is one thing clear throughout this whole transaction, and that is that Mr. Shaw intended to not only make this 200-foot rim an ornament to the park, but he likewise desired such ornament to produce some revenue for the other child of his creation, the Botanical Garden. To this end he required that leases should be made, and the proceeds paid to him in his lifetime, and thereafter by his will to the Botanical Garden. In modifying his first deed he did not undertake to destroy all his rights or interest in this 200-foot rim. If he did not do more, he at least clearly left upon the city the duty to lease this rim in the manner designated in the first deed, but he may have limited his rights (a matter we leave open because of some peculiar language in the second deed) to a suit to compel performance in a case of a willful neglect to do this thing. It is a clear duty upon the part of the city to make an attempt, in good faith, to rent this rim property as provided for in that first deed, and when so rented to pay over the rentals to the Botanical Garden. Unfortunately the pleadings in the case here

proceed upon the theory that such cannot be done. Admissions in equity against common knowledge will not bind the conscience of the chancellor. The provision as to leasing does not limit the lease to a thirty-year period alone, but provides for renewals at the end of such periods. In my judgment, it is folly to say that ground leases could not be made for a period of thirty years, with privilege in the lessee to renew the lease for a like period or periods at some reasonable rental value, and conditioned upon the placing of the villa residences on the lots as described in the deed. Extravagant rents might not be secured for these ground leases, but substantial annual rents could be secured, and to these rents the Botanical Garden is entitled.

This cannot be decreed in the instant case, because of the pleadings, but I add these few words, because I feel that Mr. Shaw has at least properly reserved for the Botanical Garden a remedy to enforce this right which he always had, and because my brother's opinion does not emphasize this view. The opinion states that there *may* be a right to enforce the performance of this duty to rent. I desire to add that there is not only a duty imposed to rent, but that a clear right is reserved to enforce this duty, when there has been a willful neglect. This right was first in Shaw and by his will passed to the Botanical Garden. Nor could the city escape this duty by showing an attempt to rent at fanciful prices. If the city can get any substantial ground rental for the use of the described lots, it is its duty to rent. It should try to rent at reasonable or even low rental sums provided it can procure the erection of ornamental villa residences on these lots. Shaw intended not only to beautify the park by these villa residences, but to get some revenues for himself and assignees. His idea was to beautify the park, and at the same time support and maintain his other charity, the Botanical Garden. He was looking into the future, and what the future will realize of his dreams, if

dreams they should be called, should be left open for realization. It is clear that the instant judgment upon any theory should be reversed and the petition dismissed. With these added observations, I concur. *Lamm, C. J.,* and *Brown, Bond* and *Faris, JJ.,* concur in these views also.

## SEPARATE OPINION.

WALKER, J.—I concur in the result reached in the majority opinion that this case should be reversed and remanded; but I am not in accord with the reasoning by which this conclusion is reached, and finding the divisional opinion of Commissioner BLAIR more nearly expressive of my views, I have, barring changes in phraseology, adopted same, and file it herewith as my separate opinion.

Appellants constitute the board of trustees of the Missouri Botanical Garden, under the will of Henry Shaw, deceased. Respondents are the city of St. Louis, the Attorney-General, and the persons constituting the board of commissioners of Tower Grove Park.

This suit was brought to procure a decree authorizing the sale, under restrictions and in lieu of leasing, of a strip of ground 200 feet wide surrounding Tower Grove Park in the city of St. Louis.

The court below denied the relief sought and, on the cross-bill, gave judgment vesting the title in the strip mentioned in the city of St. Louis, for park purposes.

In 1867, the Legislature passed "An Act to Create, Establish and Provide for the Government of the Tower Grove Park of the City of St. Louis," the most pertinent sections of which follow:

"Section 1. As much and such portions of the following described tracts or parcels of land, partly within and mostly without the present corporate limits of the city of St. Louis, to-wit: Bounded by Grand

avenue on the east, Arsenal street or road on the south, Magnolia avenue, as now existing, on the north, and the King's highway, so-called, on the west, in the city and county of St. Louis, as Henry Shaw may see fit to give, grant and convey to the city of St. Louis, for the purposes of a public park, shall be known and designated as the Tower Grove Park of St. Louis.

"Section 2. The said park shall be under the exclusive control and management of a board of commissioners, to consist of not less than five nor more than seven persons, who shall be named and styled the Commissioners of the Tower Grove Park, and who shall be appointed as hereinafter provided; but of which commissioners Henry Shaw, the donor to the city of St. Louis of the land for the said park hereby established, during his natural life, and after his death his successor, in the direction of the Missouri Botanical Garden, as he may create the same in any devise or conveyance which he may be authorized by law to make, shall be and constitute one member.

"Section 3. The following named person, Henry Shaw, and such persons as he may select, shall constitute the board of commissioners of said park. They shall hold their offices as such commissioners for five years from the time of the passage of this act, and until their successors are appointed and qualified. No member of said board shall receive any compensation for his services, but each commissioner shall, nevertheless, be entitled to receive for his personal expenses, in visiting and superintending the said park, a sum not exceeding one hundred dollars per annum. . . .

"Section 18. The said board is hereby authorized to take and hold any gifts, devises or bequests that may be made to said board, upon such trusts and conditions as may be prescribed by the donors or grantors thereof, and agreed to by said board, for the purpose of embellishing or ornamenting said park, and shall annually make in its report a statement in detail

of the condition and value of all such gifts, devises or bequests, and of the names of the persons by whom the same are so given, devised or bequeathed. . . .

"Section 24. As soon as the said Henry Shaw shall grant and convey to the city of St. Louis any land contained within the boundaries named in the first section of this act, the said land, and every part thereof so conveyed, so long as the same shall be held in fee by the said city of St. Louis, and, in consideration of such grant and conveyance by him, shall be exempt from the payment of all State, county, municipal or other taxation imposed or to be imposed under or by virtue of any law of this State whatsoever."

The act further provided for the issuance of bonds by the city in the sum of $360,000, and the payment of this sum to the commissioners of the park, this being the money referred to in section 12 of the act which prescribed that the money so coming into their hands should be applied and used in fencing, improving, ornamenting and beautifying said park. It was also provided that after the lapse of three years from the passage of the act mentioned the city should annually levy and collect a tax sufficient to produce $25,000 to be used for the maintenance of the park.

In 1868 Henry Shaw and James S. Thomas, then mayor of the city of St. Louis, executed a deed to the property in question to the city of St. Louis, and in 1872 Henry Shaw executed a second deed modifying that of 1868. These deeds are set forth in full in the majority opinion.

A plat of Tower Grove Park showing the strip 200 feet wide here involved, indicated thereon by the numbers 2103, 2104, 2107, 2108, 4100, 4101, 4106, 4107, 4108 and 4109, appears opposite page 234, Volume 151, Missouri Reports, and need not be reproduced here.

At the time of Henry Shaw's death the land in the vicinity of Tower Grove Park was but little improved,

being devoted, in the main, to market gardening, except the tract occupied by the Missouri Botanical Garden, which lay northwest of the park and practically adjoined it.

Henry Shaw died in 1889 and by his will (set out in Lackland v. Walker, 151 Mo. l. c. 222 et seq.) he devised to trustees all real estate owned by him at his death "within the following limits, to-wit, Grand avenue on the east, the road running from Grand avenue to the Old Manchester Road, and now known as McRee avenue dividing United States Survey 1519 and 3294, on the north; Arsenal street or road on the south, and King's Highway and Old Manchester Road on the west; excepting such interests and estates as I have heretofore conveyed to, the city of St. Louis, by two deeds, one bearing date the 20th of October, 1868, and the other bearing date July 9, 1872, and do therein devise to the said city of St. Louis for Tower Grove Park," and excepting certain other property not in anywise involved here.

The property described in the two deeds mentioned was situated within the general boundaries given in the will as quoted. It was not otherwise specifically mentioned in the will, but there was a general residuary clause devising and bequeathing all property of the testator, not otherwise disposed of, to the same trustees. The devise to these trustees included the Missouri Botanical Garden; and the function of the board of trustees thus created by the will was to maintain the garden, and to that end to administer the other property devised to them for that purpose in the manner prescribed by the testator and deemed by him best fitted to accomplish his expressed purpose "of having for the use of the public a botanical garden easily accessible, which should be forever kept up and maintained for the cultivation and propagation of plants, flowers, fruit and forest trees, and other productions of the vegetable kingdom; and a museum and

library connected therewith and devoted to the same
and the science of Botany, Horticulture and allied ob-
jects.''

Since the death of Henry Shaw much of the prop-
erty surrounding the park and garden has been platted,
sold and improved; streets have been paved; sewers
constructed; and, in fact, the city has spread far be-
yond the property; in the vicinity are numerous street-
car lines connecting this portion of the city with oth-
ers and making it easily accessible. Property around
the park and across the avenues therefrom averages
$40 or $50 per front foot in value, and the strip in-
volved is estimated to possess a like value. The evi-
dence is that $816,000 is a conservative estimate of
its total value. The petition alleges and the answer
admits that in view of established custom and indi-
vidual conviction now prevalent in the city of St. Louis,
the method of leasing prescribed by the deed of 1868
is impracticable and impossible.

Appellants contend Henry Shaw, in the deed of
1868, reserved a beneficial interest which under the
will passed to them as trustees for the garden; and,
having offered evidence that the income of the garden
from other sources was so depleted by the payment of
general and special taxes, paid and to be paid, as to
seriously interfere with the effectuation of Henry
Shaw's plans respecting the garden, pray a decree
authorizing the sale of the strip involved, under proper
restrictions, either to the city of St. Louis, if it de-
sires to buy same for park purposes, or to private
persons, the restrictions in the latter case to be of
such character as to be in consonance with the purpose
of the grantor expressed in the deed of 1868.

Respondents contend that the requirement as to
leasing in the deed of 1868 is a mere condition subse-
quent; that performance has become impossible and,
consequently, the city holds the title relieved of all

conditions and limitations; and on the city's cross-bill the trial court decreed the title in the city.

I. The principal question in this case is as to the nature and extent of the interest the city took under the deed of 1868 in the strip of ground two hundred feet wide which is the subject-matter of this litigation.

The intent of Henry Shaw must be gathered from the entire deed. It expressly provides that the strip mentioned shall be kept leased upon long leases for villa residences in order to make it both "a source of ornament to said park" and a source of revenue.

The habendum clause is full of significance. The city is to hold the land in fee so long as it "complies with the following conditions [already expressly referred to in the granting clause] annexed to said grant, to-wit," that all of said grant *except the strip* 200 *feet in width* shall be and remain *a public park,* etc., forever; that no portion *of said park* shall ever be used for any other than park purposes, nor shall any revenue ever be raised from the use *of any portion of said park* except such as may be consistent with its said purpose and use and which revenue *shall go to the maintenance of said park through the board of commissioners.*

"Fifth, that the board of commissioners of the Tower Grove Park shall from time to time cause to be leased the strip of land 200 feet in width so *surrounding said park* in convenient lots," etc., and pay the gross rents to Henry Shaw and to his heirs and assigns forever.

It is also provided that in case the conditions are violated in the lifetime of Henry Shaw, the property and improvements shall revert to Shaw; if violated after his death, then "the said estate hereby conveyed and all improvements thereon shall go to and be vested in whomsoever said Shaw may appoint *for the use of the Missouri Botanical Garden or directly in said garden"* if incorporated.

The correct construction of this deed is, that of the whole tract described only the 202.02 acres, as mentioned in the deed of correction of 1872 (i. e., that part within the strip here involved), was conveyed for park purposes in the proper sense. .The deed dedicates that portion to such purposes and expressly excepts the strip 200 feet wide. from that dedication. That strip was conveyed to the city clearly to enable it to control, as much as possible, the character of the improvements immediately adjacent to the park, and the grantor evidently expected that the erection, under proper restrictions, of villa residences on the strip adjacent to the park would not only furnish an ornamental border for same, but would induce similar improvements on the opposite sides of the streets and thus add materially to the beauty of the park itself. Whatever his hopes may have been, the fact is that he did not convey the fee in the strip 200 feet wide to the city. The city, therefore, under the deed of 1868 took as trustee for charitable uses and holds in that capacity. It could not take a greater interest in the strip in question than the deed gave; and the deed, properly construed, gave the title to the strip to the city as trustee for the limited and express purpose of enabling it, under its directed use, to add to the beauty and enhance the value of the park as a pleasure resort.

The beneficial interest in the strip remained the property of Henry Shaw, then the owner as well as creator of the Missouri Botanical Garden, and the deed is clear that his intentions were that at his death this interest should be devoted to the support of the garden.

The trustee, the city of St. Louis, contends that the so-called condition in the deed is impossible and, therefore, that it holds the entire estate rid of all conditions, under rules applicable to conditions subsequent. This contention ignores the well established doctrines

that forfeitures are not favored and that the terms of a grant are not to be held to create an estate upon condition if another interpretation is reasonable. Courts ought to go to the intent of the grantor and should not permit the mere use of the word "condition" to fence them from it. If Henry Shaw had intended this strip 200 feet wide to be used for park purposes he could easily have said so. On the contrary he specifically designated that part of the tract intended to be devoted to such purposes and expressly excepted this strip from that designation. The interest he conveyed to the trustee, the city, in that strip, was conveyed so that it might protect that part of the tract constituting the park and enhance its beauty by controlling the character of the residences and structures immediately adjacent to it. This was the real interest the city took directly in trust for the public. The authorities, are collected in the briefs of counsel.

The provision of section 24 of the Act of 1867 to the effect that "as soon as Henry Shaw shall grant and convey to the city of St. Louis any land contained within the boundaries named in the first section of this act, the said land and every part thereof shall be held in fee by the said city of St. Louis," related necessarily to land conveyed for park purposes, as provided by the first section, and could not operate to change or enlarge an additional grant of a right or interest in land not given for park purposes within the meaning of the act, but to enable the city to protect the park surroundings.

The provisions of the act relating to the exemption of park property from taxation are of no consequence in this case. Whether applicable or inapplicable, void or valid, is of no importance upon the question as to what interest the deed of 1868 conveyed. Nor is the deed in any sense invalidated by the rule against perpetuities. The deed itself evidences the fact that Henry Shaw's ultimate intent was to devote, after his

death, the income from the strip around the park to the support of the Missouri Botanical Garden. This garden, long before the institution of these proceedings, had become a great public charity, and the grant to it was validated by that fact, even if there could have been otherwise any substance in this contention when made by a mere trustee as the basis of a claim to the corpus of the trust estate; for whatever estate the city took, it took as trustee.

There was no waiver of any rights by the deed of 1872. That deed cleared some doubts as to the applicability of certain parts of the deed of 1868 to that part of the tract conveyed for park purposes, but expressly asserted their applicability to the strip here involved, and in nowise modified or cut down the estate reserved.

The mention in that deed of the remedy by mandamus in case there was a wilful refusal to lease the ground was in no sense preclusive. Remedies existing under the deed of 1868 remained unchanged. The language of the deed of 1872 leaves no doubt on this head.

It is urged, however, that the will does not devise to appellants any interest in the strip around the park.

The first clause of the will ends all argument on this question. If Henry Shaw reserved any interest (and we hold he did) in the land about this park, that interest passed under the will to the plaintiffs' predecessors in trust, even if the residuary clause of the will and the deed of 1868 itself be ignored in this connection.

The record does not disclose any substantial basis for what is said in respondents' brief concerning the Statute of Limitations. Therefore, that phase need not be considered.

II. The conclusion having been reached that the deed of 1868 reserved an interest in trust in the strip

in controversy and that this interest passed to and has vested in the plaintiffs as trustees of the Missouri Botanical Garden, the remaining questions have already been settled. They are identical with those presented in Lackland v. Walker, 151 Mo. 210. The charitable purpose to which the income from the land in controversy in this case was and is to be devoted is the same as in that, viz: the Missouri Botanical Garden. The defect in the mode of administration of the property, prescribed by the donor, is identical in the two cases. The power of the court to "vary the details of administration" is exactly the same. It is a mere incident that the restrictions upon leases and structures upon the property involved were prescribed in that case for the benefit of the garden itself and are prescribed in this, primarily, for the benefit of another great gift to the public. In this case, as in that, the purpose of the donor is the guiding star, and changes in details of administration, necessitated by circumstances unforeseen, ought to be made when such changes would effectuate that purpose. Upon this phase that case settles this. That the city holds the title makes no difference. It is the trustee for all who take under the deed. To the extent to which the beneficial interest is vested in plaintiffs it holds for them and for the public they represent. That the city is not the plaintiff makes no difference. Plaintiff's right to a just decree is not affected by the fact that the legal title, in whole or in part, is deposited, so to speak, with the city for their benefit.

III. It follows that under our view of this case plaintiffs are entitled to the relief prayed; and if the city of St. Louis desires to acquire the land for park purposes and add it, freed from restrictions, to the tract conveyed to it by the deed of 1868 as Tower Grove Park, it should be permitted to do so by any lawful method it may choose. To enable it to exercise

this option, this judgment should be reversed and the cause remanded with directions to the trial court to hold the cause in abeyance for a period of twelve months. If at the end of that time the city shall not have acquired the land in controversy or have instituted proceedings for its acquisition, or, if having instituted such proceedings the city shall not prosecute the same speedily to a successful conclusion, then the trial court shall proceed to render judgment in this case as herein indicated. Before doing so, the court may hear evidence upon the questions of the size of the parcels to be sold and the sort of restrictions as to the building lines and the character and cost and position generally of structures to be erected upon the lots sold, and shall include in its decree findings upon these matters and upon the character of restrictions generally to insure "that the property, when improved, will be pleasing and attractive to visitors" to Tower Grove Park and otherwise be an ornament thereto, as contemplated in the deed of 1868.

.This decree should in all respects follow, as nearly as may be, that in Lackland v. Walker, supra, care being taken to observe the rights of the city and, through it, the public, that the ornamental character of the strip two hundred feet wide as a border for the park may be permanently preserved. *Woodson, J.,* concurs in this opinion.