## SCHELL v. LEANDER CLARK COLLEGE et al.

(District Court, N. D. Iowa, Cedar Rapids Division. February 9, 1926.)

No. 61.

**1. Courts ⬤➡347—Intervening petition, not recognizing propriety of main proceeding, dismissed.**

Under equity rule 37, intervening petition, not recognizing propriety of main proceeding, will be dismissed.

**2. Charities ⬤➡2—Whether donation is public charity depends on law of state where created and administered.**

Whether donation is public charity depends on law of state where created and administered.

**3. Charities ⬤➡43—Where object of public charity fails, equity courts act at instance of state or national government as parens patriæ.**

Where object of public charity fails or is about to fail, courts of equity administer it at instance of state or national government as parens patriæ.

**4. Charities ⬤➡37—College endowment fund held public charity to which cy pres doctrine may be applied.**

College endowment fund *held* public charity, which equity court may perpetuate and administer by applying cy pres doctrine, under law of Iowa.

**5. Charities ⬤➡49—Jurisdiction to apply cy pres doctrine properly invoked by state.**

Public charity about to fail is properly represented in court of equity, to invoke jurisdiction to apply cy pres doctrine, by the state or some authorized agency thereof.

**6. Attorney general ⬤➡9—State Attorney General should institute, or be made defendant in, suit to have college endowment fund administered under cy pres doctrine.**

Under Code Iowa 1924, §§ 148, 149, suit to have college endowment fund, object of which is about to fail for lack of sufficient funds, administered by equity court under cy pres doctrine, should be instituted by state Attorney General against college or trustees thereof, or bill filed by corporation or its trustees should make Attorney General a party defendant.

**7. Courts ⬤➡262(3)—Federal court cannot perpetuate and administer charity located in state.**

Federal court cannot perpetuate and administer, under cy pres doctrine, a public charity with situs in state, whether proceeding is instituted by state, through its Attorney General or by trustee, who is citizen of such state, with Attorney General as defendant.

**8. Charities ⬤➡49—State, not church, under auspices of which college was founded, may, through agency of court of equity, propose scheme for administration of endowment fund, under cy pres rule.**

Where college endowment, constituting public charity, fails because of college's inability to administer it, the state, as ultimate beneficiary, not church, under auspices of which college was founded or existed, but which is not trustee or beneficiary of fund, will, through agency of court of equity, propose new scheme for its administration by equity courts under cy pres rule.

**9. Charities ⬤➡49—Instrumentality or member of church, under auspices of which college was founded, may sue to prevent unlawful disposition of endowment fund.**

Where object of college endowment constituting public charity cannot be carried out, even an instrumentality or member of church, under auspices of which college was founded or exists, has sufficient interest to invoke jurisdiction of proper court to prevent unlawful disposition of fund, until jurisdiction of equity court to rescue charity by application of cy pres doctrine is properly invoked.

In Equity. Suit by William E. Schell, as a member of the Church of the United Brethren in Christ, on behalf of himself and other members similarly situated, against Leander Clark College, an Iowa corporation, and others. Entry of decree, denying relief prayed for in part and granting it in part, directed.

James & Coolidge, of Dayton, Ohio, for plaintiff.

H. E. Spangler, of Cedar Rapids, Iowa, for defendants.

SCOTT, District Judge. William E. Schell, a citizen of the state of Ohio, filed and exhibited his bill in equity as a member of the Church of the United Brethren in Christ on behalf of himself and other members of that church similarly situated, but too numerous to be joined as plaintiffs, and naming as defendants Leander Clark College, an Iowa corporation, 29 individuals, alleged to be trustees of Leander Clark College, and Coe College, an Iowa corporation. Leander Clark College is alleged to have its principal place of business at Toledo, Iowa, and Coe College, at Cedar Rapids, Iowa, both in the Northern district of Iowa, and all individual defendants are alleged to be residents and citizens of the state of Iowa. The requisite amount in controversy for jurisdictional purposes is also alleged. Plaintiff further in substance alleges:

That the Church of the United Brethren in Christ is an unincorporated association. That it belongs to the "associated class of churches," and is governed by official boards, quarterly conferences, annual conferences, and a general conference, which are subordinate to each other in ascending progression in the order named. That the organic law of the church is embodied in the church disci-

pline, which is subject to amendment only by the General Conference of the church which meets quadrennially. That for over 100 years the Church of the United Brethren in Christ has conducted its religious, benevolent, and educational activities in the United States and foreign countries. As part of its religious, benevolent, and educational work, in the year 1856, it established a church college in the state of Iowa. That college for many years has been located in the city of Toledo, Tama county, Iowa, and since 1903 it has been known as Leander Clark College. Throughout its existence it has been supported by, has acknowledged allegiance to, and has recognized the domination over it of the Church of the United Brethren in Christ, and under the provisions of its articles of incorporation its trustees are elected triennially by the Iowa, Minnesota, Wisconsin, and Illinois Conferences, all annual conferences of the Church of the United Brethren in Christ, and in relation to Leander Clark College, known as "the co-operating conferences." That with reference to church colleges, the organic law of the church—the church discipline—provides for a board of education, same being an Ohio corporation, to which is delegated general supervisory powers over all church schools. It determines to what annual conferences of the church each school shall be tributary. No school or college may be established, discontinued, relocated, or consolidated with any other without its consent. Leander Clark College, throughout its existence, has met with the requirements and regulations and has recognized the authority of said board of education and of the church discipline as adopted by the General Conferences.

That in the year 1917 Leander Clark College was, and theretofore had been, supplying the educational needs of the church of the Mississippi Valley in a satisfactory manner. It had an endowment fund of approximately $200,000, and buildings and equipment adequate to its needs. That in the month of June, 1917, the suggestion had been made that, on account of the war conditions then existing, it would be desirable to consolidate Leander Clark College with Coe College, a neighboring institution of learning, located at Cedar Rapids, Iowa, and such a proposal had been made to the trustees of Leander Clark College. A committee was appointed by said trustee to consider the suggestion, and its report, which was favorable to the plan of consolidation that had been drawn up, was approved by the trustees,

who thereupon caused it to be brought before the meetings of the co-operating annual conferences of the church in the fall of that year. With the exception of the Iowa conference, none of the co-operating conferences were favorably disposed or took favorable action thereon. That the board of education of the church absolutely disapproved of the plan, and refused its consent to the merger. That the board of education thereupon drew up a new plan for consolidation with Coe College, which was presented to the various co-operating conferences and was acted upon favorably by all of them. That because of the unsettled effect of the consolidation discussion, and on account of the disturbing conditions existing because of the war, Leander Clark College did not open in the fall of 1918. That, believing the plan proposed by the board of education would be carried through, the co-operating conferences authorized the trustees of Leander Clark College to dispose of the campus property at the college in such manner as they might deem advisable. That the articles of incorporation of Leander Clark College expressly provide that no transfer of campus property shall be valid without authorization of the co-operating conferences.

That Coe College objected to said plan of consolidation, and in November, 1918, the board of trustees of Leander Clark College rescinded all action taken by them, in adopting the board of education's plan, but continued negotiations looking to such consolidation upon a new plan, differing materially from that approved by the co-operating conferences and the board of education. That in the month of April, 1919, the board of education met to consider the new plan, and rejected the same, and Leander Clark College trustees were apprised of this action. That in total disregard of this fact, however, and without the consent or approval of the board of education, Leander Clark College, through its officers and trustees, willfully and wrongfully proceeded to attempt to carry out the merger with Coe College on terms disapproved by the board of education, transferred its endowment fund to H. J. Stiger, defendant herein, and directed him to convey same to Coe College pursuant to the unauthorized merger plan.

That defendant Leander Clark College, through its officers and trustees, purporting to act under authority granted by the co-operating conferences in the fall of 1918, caused its campus property at Toledo, Iowa, to be transferred to the state of Iowa for

use as a state institution for destitute orphan children. That the authority to transfer said property had been granted by the co-operating conferences as a part of its action approving the union with Coe College drafted by the board of education, and was intended, as defendant trustees well knew, to authorize them to act thereunder only in connection with the carrying out the consolidation on the terms approved. That such action upon the part of the Leander Clark· College trustees is a breach of trust, for which they should be required to make restitution. That following this unauthorized action, in the fall of 1919, the co-operating conferences took formal action disapproving such action of defendant trustees.

That plaintiff is informed and believes that defendant H. J. Stiger is still in possession of the endowment fund of Leander Clark College, turned over to him by the trustees; said fund, as plaintiff is informed, amounting in excess of $200,000. That by reason of the foregoing the Church of the United Brethren in Christ is prevented from carrying out its religious, benevolent, .and educational work at Leander Clark College, and Leander Clark College is deprived of the use of its endowment fund. That unless defendant Stiger is enjoined by this court from transferring said endowment to Coe College, and from otherwise disposing of them without the order and approval of this court, both Leander Clark College and said church will be deprived of and will lose both the principal and income of said fund. That plaintiff and the board of education of the church, and other agents and persons interested in the church and its educational institutions, have made frequent demand and effort to induce Leander Clark College and its trustees to take the action necessary to right the wrongs above complained of, but defendants have ignored said demands and refused to take any action in the premises.

Such are in substance the allegations of the plaintiff's bill, and upon these allegations plaintiff prays: (a) That defendant H. J. Stiger may be enjoined from transferring the endowment fund of Leander Clark College, or the income therefrom, to Coe College, and from making any transfer or disposal thereof, except as ordered by this court, and prays for an order directing defendant Stiger to retransfer and deliver to Leander Clark College the endowment fund and the accretions thereto. (b) That defendants herein may be enjoined from taking any further action or proceedings looking towards the carrying out of any plan for merging defendant Leander Clark College with defendant Coe College, which first shall not have had the sanction of the board of education of the church. (c) That defendant trustees (naming 29 of them) may be required to account for and pay over to Leander Clark College the value of the campus property. (d) For general equitable relief.

In pursuance of the filing of this bill, subpœna duly issued and was served upon the corporations Leander Clark College and Coe College, but no service was ever effected upon any of the individuals alleged to be trustees of Leander Clark College, with the exception of G. H. Struble, and that none of such individuals, with the exception of G. H. Struble, who is of counsel for defendant corporations, have ever appeared to or answered said bill.

The defendants Leander Clark College, Coe College, and G. H. Struble appeared and jointly answered the plaintiff's bill. The defendants admit the corporate capacity and citizenship of the corporate defendants, and the allegations as to the amount involved. They admit that 16 of the individuals named, not including defendant Struble, were during the year 1919 trustees of Leander Clark College, but deny that any of the other individuals were then, or at any other time, trustees of said corporation, and deny that certain individuals were, at the time of the commencement of the suit, citizens or residents of Iowa, and the defendants deny all of the other allegations of the plaintiff's bill. These defendants, further answering, in substance allege:

That during the year 1906 Western College was a corporation organized under the statutes of Iowa, with its principal place of business at Toledo, Tama county, Iowa. That in 1902 said college was heavily in debt and entirely without an endowment fund. That at the annual meeting of its trustees in June, 1902, a resolution was adopted in reference to raising an endowment fund for said college and proposing that the college would change its name to the name of any one who would give the sum of $50,000 to such fund. That thereafter, on June 13, 1903, Maj. Leander Clark, of Toledo, Iowa, submitted to the trustees of Western College a proposition offering to donate $50,000 upon certain conditions, and a copy of the proposition is exhibited on defendants' answer. That on June 15, 1903, the trustees of said college at its annual meet-

ing accepted the terms and conditions of such proposition, and thereafter an endowment fund of $150,000 was contributed by a payment by Leander Clark of $50,000, a payment by Andrew Carnegie in the sum of $50,000, and by subscription and payment of Daniel McIntire in the sum of $10,000, and by numerous other smaller subscriptions by residents of the town of Toledo and vicinity, in a sum sufficient, together with the aforesaid subscriptions, to aggregate $150,-000. That all of said donations were made upon the terms and conditions provided for and laid down in the proposition of said Leander Clark. That no part of said endowment fund was contributed by the Church of the United Brethren in Christ, or by the board of education or any of the conferences of said church.

That thereafter, on June 12, 1907, said college changed its name from Western College to Leander Clark College, by adopting articles reincorporating said college under the name Leander Clark College. A copy of the articles of reincorporation are exhibited in defendants' answer, and which articles provide that the affairs of the corporation shall be under the control of a board of trustees. That thereafter Leander Clark College continued to operate a college at Toledo, under said articles of incorporation, up to June, 1918. That prior to 1918 the enrollment of students in said college continually decreased, and the expenses of operating the same increased, and for such years the college operated with an increased deficit each year. That the income received from the endowment fund, although the same was kept well invested, and from other sources, was insufficient to meet the requirements of the college and pay operating expenses. That during said period of years every effort was made upon the part of the management of the college to secure additional funds and additional endowment, but without success. That on account of said facts the board of trustees of said college and faculty found it impossible to further operate the college, and at the annual meeting in June, 1918, the trustees took proper action and closed the college as an educational institution. That the board of trustees of Leander Clark College, having of necessity closed the same, then considered ways and means of further administering said endowment fund in accordance with the proposition contained and submitted by said Leander Clark, and the conditions under which the other contributions were made. That at a

10 F.(2d)—35

special meeting of the trustees held at Toledo, on April 23, 1919, a report of a committee on consolidation with Coe College was adopted by a unanimous vote of the trustees. Copy of such report is exhibited on the answer. That a further committee was then by unanimous vote appointed to confer with Coe College in perfecting the consolidation, and that thereafter, on June 9, 1919, the trustees at their regular annual meeting of 1919, received and adopted the report of said latter committee, and passed a further resolution by a unanimous vote effecting said consolidation and setting forth its details.

That Coe College was at the time and now is a college of higher Christian education, located in the city of Cedar Rapids, Linn county, Iowa, a distance of 50 miles from Toledo. That Coe College was then and now is serving the educational needs of practically the same territory as that served by Leander Clark College. That the general courses of study and curriculum of Coe College were and are now of a standard which Leander Clark College had tried to maintain. That Coe College was at the time, and is, a thriving institution, with a large endowment fund, with a large number of substantial buildings, thoroughly and modernly equipped, and with a faculty consisting of the highest class of educators. That in connection with the courses of higher education taught therein, special emphasis was given and is given to those studies having to do with Christian life and education. That Coe College was and is an admirable institution to administer the terms and conditions attached to the endowment fund contributed by Leander Clark and other donors to Leander Clark College. That on June 10, 1919, Coe College, by a proper resolution adopted by the board of trustees, agreed to the consolidation of Coe College and Leander Clark College as proposed by Leander Clark College, and amended its articles of incorporation in conformity therewith, and in acceptance of the trust to administer the endowment funds referred to in accordance with the terms and conditions of the proposition submitted by said Leander Clark, under which said endowment funds were created and raised. That said two colleges by such proceedings sought to and did in fact carry out the trust imposed upon said Leander Clark College in relation to said endowment fund, and did in fact, as nearly as could be done, in view of the failure of Leander Clark College to function, carry out the terms and conditions attached to said Leander Clark

endowment fund. That said consolidation was made for the express purpose of preventing the failure of said trust created by said Leander Clark and other donors.

The answering defendants further in substance allege: That the campus of Leander Clark College and buildings located thereon were donated by the residents of Toledo, Iowa, and vicinity, with a desire to establish in said community a public institution. That after the closing of Leander Clark College in 1918, and the abandonment of said college buildings and college campus for college purposes, and during negotiations for consolidation with Coe College, the question of the disposition of said campus and buildings arose. That said properties were useless to Coe College, and could not be used in said consolidation and in administering said trust fund, and that said buildings were not suitable for any purpose, except for a public institution of some kind, and that said trustees of Leander Clark College were of opinion that, inasmuch as said campus and buildings had been donated by the citizens of Toledo and vicinity, said campus and buildings should be returned to the citizens and residents of Toledo for such use as the city of Toledo might determine. That the articles of incorporation of Leander Clark College provide:

"Article XII. The board of trustees shall have power to sell and convey by deed or otherwise, or to incumber by mortgage or otherwise, any real estate or other property of the corporation: Provided, however, that no sale or conveyance of the land now or hereafter constituting the campus of Leander Clark College, at Toledo, Iowa, or any part thereof, shall be of any validity unless said sale and conveyance be authorized by a majority vote of each of the bodies at the time co-operating in the maintenance of the college; and provided, further, that neither said campus nor the Bright Conservatory of Music shall at any time be mortgaged or placed in trust to secure any indebtedness that the corporation may owe or for any other purpose."

That the co-operating bodies at the time consisted of the Alumnal Association of Leander Clark College, the Iowa, Minnesota, and Wisconsin Conferences of the Church of the United Brethren in Christ, and that each of said co-operating bodies authorized the board of trustees of Leander Clark College to convey said campus property. That in pursuance of said authority said trustees caused the campus and buildings to be transferred to a representative of the city of Toledo, who thereafter transferred the same to the state of Iowa for use as a state school for dependent and neglected children, and the said property has been so used ever since.

Defendants pray for a dismissal of the plaintiff's bill and for costs.

The defendants later amended the foregoing answer, setting forth a division which they denominate a counterclaim, and in which they allege that the management of said endowment fund in accordance with the donors' intention prior to the proposed consolidation of Leander Clark College with Coe College had become impossible, and in order that the same might still be preserved and used for the purpose of such intention it was necessary that the attempt to maintain and continue Leander Clark College at Toledo, Iowa, as an institution, be abandoned, and that a new scheme or method be devised for the perpetuation and continuance of said trust, as nearly as possible in accordance with the intent of said donors; that the plan of consolidation set forth in the agreement for consolidation between Leander Clark College and Coe College, for the administration of the endowment fund and the perpetuation of said trust, is as nearly as possible in accordance with the intention of the donors, and if carried out will effectually preserve said trust and insure the perpetual use of said endowment fund for higher education in the vicinity of Tama county, Iowa, as intended by said donors; that defendant Coe College is able, ready, and willing to continue with said scheme of consolidation and administration of said trust fund, and there is no other plan or scheme which would as well meet the conditions of said trust; that, it being impossible to maintain and continue Leander Clark College at Toledo, Iowa, as an institution of higher learning, it·became necessary to find some use for the college campus and buildings in Toledo, which would be in accordance as near as possible with the desires and intentions of the persons who originally contributed to and purchased said campus property and buildings; that the plan of using said campus and buildings for the use as a school for neglected children was the most desirable use to which said properties could be given. The defendants then pray that the plan of consolidation agreed to by Leander Clark College and Coe College, set forth in this answer as amended, be approved and adopted, and the administration by Coe College of such trust fund be approved and adopted; that the use of the

campus property and buildings for said school for neglected and dependent children be approved and adopted.

The plaintiff filed a reply and answer to said counterclaim, in which he denies that it had become impossible to administer the endowment fund of Leander Clark College in accordance with the donors' intentions with reference thereto prior to the proposed consolidation with Coe College, and denies that it was necessary to find any use for the campus property and college buildings at Toledo, other than the purposes and use of Leander Clark College. He admits that Coe College is willing to accept the endowment fund upon terms not approved or authorized by the board of education, and plaintiff denies every other allegation of the defendants' answer as amended.

Such are the issues presented by the plaintiff's bill and defendants' answer as amended.

[1] One Louise C. Lupton appeared and filed a petition of intervention as the sole heir of Leander Clark, deceased, and in which she alleges the failure and lapse of the trust in connection with the contribution of her ancestor, Leander Clark, and claims the same adversely to both plaintiff and defendants. This intervener's counsel, however, did not participate in the trial, or do more than ask leave to file the petition. Upon examination of the petition I am of opinion that the same is in contravention of equity rule 37, and that it does not recognize the propriety of the main proceeding, and should for that reason be dismissed. However, conceding its consistency with said rule, I am of opinion that it should nevertheless be dismissed on its own allegations, and it will be so ordered.

Although plaintiff's bill was filed as a class suit, no other member of the Church of the United Brethren in Christ has joined the plaintiff. On the contrary, a large number of individuals, alleging themselves to be members of the Church of the United Brethren in Christ in good standing, have attempted to appear as interveners, and to join the defendants and urge the dismissal of plaintiff's bill and the approval of defendants' plan of consolidation. This pleading, I think, must also be dismissed or stricken from the files.

Upon the trial of the case, at which a large amount of testimony was taken and many exhibits introduced, the plaintiff, as I conceive it, abandoned that part of his bill which pertained to the campus and college buildings, which had been conveyed to the state of Iowa, and converted into an indigent children's school. No competent testimony was offered as to the value of the buildings, and no accounting was attempted. Indeed, without the presence of the individual defendants on the record, this seemed to be the necessary course. The matter in dispute, therefore, is narrowed down to the endowment fund contributed to Leander Clark College under the Leander Clark proposition. The case has been argued on the briefs, as I conceive it, from this standpoint. From the evidence taken on the trial the following facts appear to be established:

That the Church of the United Brethren in Christ is an unincorporated association belonging to the "associated class of churches," and is governed by conferences, quarterly, annual, and general. The General Conference meets quadrennially, is the legislative body of the church, and is composed of delegates chosen by the various congregations of the church. The organic law of the church is embodied in the church discipline, which is subject to amendment only by the general conference. Among other boards, it has a board of education, which is a body incorporated under the laws of the state of Ohio, the functions of which are, as defined in its articles of incorporation, "to raise funds and to disburse them for the promotion of theological and collegiate education in the church, and to publish and distribute books, tracts, and periodicals, etc., for the advancement of general education therein."

In the year 1856 there was organized under the laws of Iowa a corporation, the name of which was "the board of trustees of Western College of the Church of the United Brethren in Christ." The purpose of this corporation is stated in its articles to be "to obtain moneys, furnish material and build or erect, or cause same to be done, a college or seminary building with necessary appurtenances, * * * to be known as the Western College of the Church of the United Brethren in Christ." The incorporators were Solom Weaver, Martin G. Miller, William H. Shuey, Daniel Runkle, and Jonathan Neidig, apparently residents of Linn, Johnson, and Cedar counties, Iowa. Following the organization of this corporation, the incorporators and citizens of the community proceeded to obtain donations from the general public, some of money and some of tracts of land, largely, if not entirely, within the state of Iowa, and a small

college building was built at the little village of Western, in southern Linn county, Iowa. The village was a so-called inland village, not being on any line of railway, and no railway ever was built to or through the village. The college, like many other small institutions of learning in Iowa, and other Western states, was maintained by contributions of generally philanthropically disposed persons throughout the state, with possibly some contributions from other states. So far as the record shows, no contributions were ever made to create or maintain the college by the church as an organization, or by any conference or board of the church. This little college continued under the natural vicissitudes of the times to function at Western until the year 1881. The college at this time was in debt in the sum of something more than $25,000, and its existence was precarious.

Shortly prior to 1881, in some way, the details of which are not clear from the record, a movement was inaugurated to move the college from the inland village of Western to the town of Toledo, an important town and the county seat of Tama county, Iowa. This movement was welcomed by the citizens of Toledo, and without regard to church affiliation they organized and procured means to donate a campus site and something more than $20,000 for the erection of a college building. The college was moved to Toledo, in 1881, the site and contributions accepted, and, borrowing the balance of the money, a college building was erected. The name of the college shortly thereafter was contracted to "Western College." Western College continued to function at the town of Toledo, with varying fortunes and without any endowment fund, until the year 1903. So far as the record shows, the Church of the United Brethren in Christ, neither as an organization nor through any of its boards, conferences, or other auxiliary organizations, ever contributed any money to the support of this college during the period of its existence. The board of education of the church did give it some supervision, received reports annually at least over some period of time, and generally endeavored to encourage the trustees and faculty of the college and the citizens in the community in which it was located to exert themselves to procure the necessary funds for its support. So far as the record shows, the funds for the support and maintenance of the college throughout its entire career have been contributed by philanthropically disposed citizens, with-

out regard to church affiliation, very largely from Iowa, and particularly the town of Toledo and its vicinity. A relatively small proportion of contributions, however, did come from individuals residing in other states. Shortly prior to the year 1903, one of the periodical efforts appears to have been made, and the floating debt, which almost constantly accompanied the college throughout its career, was liquidated, or at least reduced to a relatively small indebtedness. As recited in a document about to be considered, "the burden of debt had been lifted." Up to this time, however, the college had never had an endowment fund.

In June, 1903, Maj. Leander Clark, a wealthy and philanthropic citizen of the town of Toledo, but not a member of the Church of the United Brethren in Christ, addressed to the board of trustees of Western College a communication which later resulted in the endowment of the college. Inasmuch as the language and terms of that communication is deemed of controlling importance in the decision of this case, I shall set that communication out at this point. The communication was as follows:

"Toledo, Iowa, June 13, 1903.

"To the Board of Trustees of Western College—Gentlemen:

"For some months past I have had under consideration the resolution passed by you at your meeting in June, 1902, wherein you approve of a movement to raise an endowment fund for the college, and propose to give the name of the college to any one who will donate the sum of fifty thousand dollars to such endowment fund.

"I have lived in Toledo for many years, have seen the college established here, have watched with interest its varying fortunes, and observed the benefits it has conferred upon the community and upon the church under whose auspices it is managed, in providing the means of a good education to many who would otherwise have been deprived of such advantages, and I have from time to time contributed to its support, believing that in so doing I was aiding a worthy cause, and, now that the burden of debt has been lifted, it is in my opinion that the next necessity of the institution is an ample, permanent, and well-guarded endowment fund. To encourage the raising of such fund, I have concluded to accept the proposition made in your resolution above referred to, and I hereby propose to lay the foundation for an endowment by making a donation of the sum of fifty thousand dol-

lars on the terms and conditions following, to wit:

"(1) Said donation is to be payable, according to the terms hereof, in cash, or in notes bearing interest at not less than 5 per cent. per annum, payable annually and secured by first mortgages on clear and unincumbered farms, or lands worth twice the value of the sums so secured.

"(2) Said donation is payable only upon the express condition that said college or its friends shall secure additional donations to said endowment fund in the sum of one hundred thousand dollars in cash, or in notes bearing interest at not less than 5 per cent. per annum, payable annually, and secured by first mortgages on clear and unincumbered farms or lands worth twice the amounts so secured—the whole of said additional sum of $100,000 to be raised and paid or secured to the college in the form and manner aforesaid on or before January 1, 1906.

"(3) H. A. Shanklin, cashier of the Toledo Savings Bank, and W. A. Dexter, cashier of the First National Bank of Toledo, Iowa, or their successors as such cashiers, shall be a committee who shall carefully examine all the funds and securities offered by the college as going to make up said additional sum of $100,000, for the purpose of determining whether or not condition No. 2 above has been fully and fairly complied with. Said committee may demand abstracts of title to lands offered as security, and any other evidence necessary to the proper discharge of its duties, and shall tabulate all funds, notes, and securities offered, and report the same, with its findings, to the undersigned not later than January 10, 1906; and as soon thereafter as the undersigned is satisfied that condition No. 2 above has been fully and fairly complied with, he shall report that fact to the endowment committee appointed by the board of trustees. But should the undersigned not be living to receive the report of said committee, or should he for any reason be incapacitated to consider the same, then said committee shall make its report in like time and manner to the judges of the district court of Tama county, Iowa, and said judges shall fully consider the same, and if they are satisfied that condition No. 2 above has been fully and fairly complied with, they shall report that fact to the endowment committee appointed by the board of trustees.

"(4) Upon such report being made to the endowment committee, either by the undersigned or by said judges, a meeting of the board of trustees shall be called (if not already in session) as soon as is practicable, and said board shall then, by proper action made of record, formally accept said donation of $50,000, with all the terms and conditions on which it is offered as herein expressed, and solemnly pledge the college to the strictest compliance with such conditions forever, and thereupon said sum of $50,000 shall be due the college in manner and form as aforesaid, and the same shall be paid to the college by the undersigned or his legal representatives. And at the same meeting the said board of trustees shall make provision for the change of the name of the college to Leander Clark College, and shall provide for such change by proper amendment of its articles of incorporation, and forever thereafter the college shall be known as Leander Clark College.

"(5) The whole of said sum of $150,000 shall constitute a permanent endowment fund, the principal of which shall be protected and forever held sacred as such, and no part of it shall ever on any pretense, or in any emergency, be pledged or hypothecated for any purpose, or be diverted directly or indirectly to any other purpose, or temporarily or permanently loaned to any other fund of the college, but it shall be kept at interest, at the best rate obtainable, and secured only by first mortgages on clear and unincumbered farms or lands worth twice the amount secured thereby, and the board of trustees shall establish and continue in perpetual operation the proper agency for keeping said fund fully and securely loaned as herein contemplated.

"(6) The board of trustees shall by proper action provide for such periodical expert examination of said fund—principal and interest—as will insure its proper investment, its businesslike management, and a proper accounting by those having it in charge.

"(7) The interest arising from said fund of $150,000 shall be used under the direction of said board of trustees as a faculty fund only—that is, for the payment of president and teachers—and no part of it shall ever be diverted to any other use or purpose.

"(8) If by any mismanagement or misfortune any part of the principal of said fund should be lost, then the board of trustees will at once proceed to raise other money to make such loss good, and the money so raised shall be forever held sacred to the same purpose as the original fund.

"(9) In order that the trustees may never lose sight of the obligations assumed by the college in relation to the said fund, the

board shall make provision for the reading of the permanent conditions hereof on the first day of each regular session, and they shall be so read accordingly.

"(10) The time designated above for the raising of said $100,000 by the said college is of the essence of this proposition, and if said sum is not raised by January 1, 1906, as contemplated in No. 2 above, then this proposition shall be absolutely null and void and of no effect.

"(11) This proposition is to become effective and binding upon the undersigned only upon its acceptance by the board of trustees of said college at its regular meeting in June, 1903; but, if so accepted by said board, it shall be binding, not only upon the undersigned, but also upon his heirs and legal representatives for the time and upon the terms hereinbefore named.

"In conclusion, I desire to state that my purpose in making this proposition is to encourage the friends of the college to rally to its support, and to aid in establishing it upon a financial foundation that shall be enduring. It is my opinion that men of wealth will more readily contribute to a fund which is so safeguarded as to be a means of good forever, than to one which may by some possibility be lost or diverted from its original purpose. With the double view, therefore, of making sure that my own contribution shall forever be held sacred to its purpose, and of encouraging others to join with me in raising a fund which will insure to the college not only temporary relief, but perpetual prosperity and efficiency, I have deliberately provided that the whole sum of $50,000 contemplated by this proposition shall be in funds of certain value, and that, when raised, they shall be invested and managed with the utmost care and wisdom. I have deemed these closing remarks expedient for the purpose of explaining the good faith of this proposition to such as may not have considered, so fully as I have done, the necessity of guarding against the diversion of an endowment fund to other uses, and thus in the end defeating the object of the donors.

"Respectfully submitted, Leander Clark."

The proposition of Maj. Leander Clark, just quoted, was accepted by the board of trustees of Western College in accordance with its terms, and such acceptance was approved in due time by all of the cooperating conferences. In due time the trustees and faculty of the college, aided by an active public spirit in the town and vicinity of Toledo, put forth a vigorous and organized effort to raise the balance of the $150,000, initial endowment fund proposed by Leander Clark. Through the good offices of Hon. William B. Allison, then United States Senator from Iowa, Andrew Carnegie agreed to and did contribute the sum of $50,000. D. McIntire, of Gladbrook, Iowa, contributed $10,000. Kiester Bros., of Scottdale, Pa., contributed $5,000. The citizens of Toledo raised among themselves something more than $20,000, and an intensive campaign throughout Iowa was conducted, extending also into other states, and the balance of the $150,000 was raised by small donations, the great majority of which were in sums of from $1 to $25. As stated, Leander Clark was not a member of the Church of the United Brethren in Christ, neither was Andrew Carnegie, and it is clear from the whole record that very much the larger proportion of this fund was contributed by persons not affiliated with said church.

It is without controversy in the record that all donations to this fund were made upon the terms and conditions of the Leander Clark proposition, and that the endowment fund, as it might in the future be augmented, should remain strictly subject to the terms and conditions of said proposition. Indeed, the document signed by Leander Clark embodying his total proposition is the constating instrument of this endowment.

Following the raising of the entire fund and action by the various conferences, which, of course, extended over a considerable period of time, the articles of incorporation of Western College were amended, changing the name to "Leander Clark College," and providing with respect to said endowment fund as follows: "And the endowment of $150,000, secured under the proposition made by Hon. Leander Clark and accepted by the board of trustees of said corporation in June, 1903, which fund is commonly known as the 'Clark-Carnegie Endowment,' shall be held, invested, and its income used only and forever in strict accord with the conditions of the proposition under which it was secured."

After the endowment of the college it proceeded to function with more ease and efficiency. However, it soon found it difficult to keep pace with the times. It was centrally located with respect to very strong competition. About 75 miles to the southwest was the city of Des Moines, capital of the state, with a number of strong educational institutions, including Drake University. About 75 miles to the southeast was the State University of Iowa. About 50 miles directly

east, and at Cedar Rapids, was Coe College, a very strong and popular institution of learning. Directly north, less than 50 miles, was the Iowa State Normal School at Cedar Falls. And about 50 miles west, the Iowa State Agricultural College, with a varied technical curriculum. About 75 miles to the northeast was the Upper Iowa University. These various schools were serving, with the highest efficiency and economy, all of the territory designed to be served by Leander Clark College, and with the passing of each year that little college found it more difficult to hold its attendance and raise the necessary funds to pay operating expenses. The board of trustees were constantly resorting to borrowing money. They even anticipated interest installments of the sacred Leander Clark endowment fund, and in May, 1918, there was a floating indebtedness accumulated of more than $22,000. In the meantime the college buildings and property had been neglected, the roofs were leaking, the walls had begun to crumble, the heating plant was out of service, and the trustees and faculty forced to segregate rooms and install stoves in the winter season, in order to accommodate the small classes which remained. The library had become very obsolete. The laboratories were deficient, and conditions generally were such that the end of the little college was inevitable. This condition had not come about because of inaction upon the part of the board of trustees or faculty, or the citizens of the town and vicinity of Toledo. A most desperate effort had been made to raise funds. Repeatedly money-raising campaigns had been attempted, but they were failures. One intensive campaign, aided and in part directed by the secretary of the church, resulted only in a failure to pay expenses.

In the face of these conditions, from some source was suggested the scheme of consolidating Leander Clark College with Coe College at Cedar Rapids. The initial step was taken in January, 1917, in which an overture was brought from Coe College to the board of trustees of Leander Clark College, looking to a merger. This proposal continued under consideration during the summer of 1917, and in the fall of that year the plan was approved by the Minnesota conference, but no other conference appeared to have acted on the question. The proposal was then brought before the board of education at a meeting at Cedar Rapids on May 23, 1918. The board of education at this meeting disapproved of the plan as formulated, and in co-operation with a committee from Coe

College the board of education formulated a second plan at the same meeting, the principal features of which were, instead of transferring the endowment fund to Coe College in consideration of certain covenants, a board of trustees, composed of members of the Church of the United Brethren in Christ, was to take over the fund, the interest only to be paid to the trustees of Coe College, and Coe College was to conform to numerous conditions laid down in the plan, largely of a religious character, and to guarantee full fidelity to the fundamental principles of evangelical Christianity and to the Bible as the inspired word of God, and providing further that, "should the time come when, in the judgment of the board of education of the Church of the United Brethren in Christ and the trustees of the college board of the Presbyterian Church, Coe College is not fulfilling its guarantee of full fidelity to the principles of evangelical Christianity and to the Bible as the inspired word of God, then this Leander Clark fund shall revert to the board of education of the Church of the United Brethren in Christ, to be used to carry out the purposes of the Leander Clark foundation within the territory co-operating with Leander Clark College at the time this union was effected." This plan was submitted to the board of trustees of Coe College, which board, by reason of certain conditions attached to certain benefits which Coe College was eligible to receive from the Carnegie Foundation, and which the board of trustees of Coe College deemed would be contravened by the proposed plan, declined to approve such plan.

Following this action, on November 29, 1918, the trustees of Leander Clark College adopted a resolution rescinding their previous action, and appointed a committee to notify Coe College thereof. This committee did notify Coe College of the action stated, and also proceeded the following April to report a third plan for consolidating the two colleges. This third plan was approved by the board of trustees of Leander Clark College, and the committee was directed to co-operate with Coe College in perfecting the amendment to the articles of incorporation of Coe College, and also by unanimous vote authorized and directed the transfer of the campus property of Leander Clark College to H. J. Stiger as trustee for the city of Toledo, with authority to said Stiger to convey to such corporation, individual, or the state of Iowa, as directed by the corporate authorities of the city of Toledo; the intent being

that the title should eventually be lodged in the state of Iowa for the purposes of a state school for dependent and neglected children. Now the second plan formulated by the board of education had been submitted to and approved by all of the co-operating conferences, and, apparently assuming that the plan would succeed, these conferences by resolution authorized the board of trustees of Leander Clark College to dispose of the campus property; this later action to comply with article 12 of the articles of incorporation of Leander Clark College. The board of trustees of Leander Clark College, in carrying out the third plan, apparently assumed that the authority therefor granted by the conferences was sufficient to justify their act in conveying the campus property, following the supposed confirmation of the third plan.

The third plan, which was finally agreed upon between the two colleges, contained 11 paragraphs. In view of the conclusion to which I have come, it would serve no useful purpose to set these articles out at large. I shall therefore, at this point, indicate only the subject and substance of each paragraph; (1) The two colleges to be consolidated under the name "Coe College." (2) The articles of incorporation of Coe College to be amended to permit the carrying out of the plan. (3) That the amendment to the articles of incorporation shall contain provisions for the protection of the endowment fund of Leander Clark College, as provided in the plan submitted by Maj. Leander Clark. (4) That article 13 of the articles of incorporation of Leander Clark College should become a part of the articles of incorporation of Coe College (this article was designed to maintain the integrity of the Leander Clark proposition and said endowment fund). (5) Leander Clark College to transfer to Coe College the endowment fund. (6) The present secretary of the endowment fund to continue in office until the consolidation was perfected. (7) Real estate and buildings, including campus of Leander Clark College, recommended not to be transferred to Coe College. (8) Agreement that Coe College, after consolidation, elect as trustees five members to be nominated by the trustees of Leander Clark College. (9) All graduates of Leander Clark College to be enrolled as alumni of Coe College. (10) Coe College to take over as many members of the faculty of Leander Clark College as practicable. (11) One of the buildings on campus of Coe College, or a new building, to be desig-

nated and known as "Leander Clark College Building."

The foregoing plan of consolidation is the one challenged by the plaintiff's bill, and championed by defendants' answer. I think it may be fairly said that the plaintiff's bill proceeds upon the theory that Leander Clark College was founded, created, and at all times supported and maintained by the church as that church functioned; that the college was a mere agency of the church to carry on its benevolent and educational work; that the ultimate dominion of the endowment fund rests in the church; such fund to be administered through the instrumentality of the church only. The theory of defendants' answer is that Leander Clark College is an independent corporation, organized under the statutes of Iowa, with plenary powers, limited only as respects the endowment by the terms and conditions and purposes of the Leander Clark proposition; that the Leander Clark proposition imposed upon the corporation Leander Clark College the trust of administering a public charity in a certain specified form; that through lapse of time and change of conditions the administration of said charity as specified by Leander Clark has become impossible; that some new plan must be formulated and adopted for carrying into effect the general purpose of Leander Clark and his associates, or the charity must fail.

Having stated and found the issues and facts as I conceive them to be disclosed by the pleadings and warranted by the evidence, I proceed to a consideration of the legal questions which I deem necessary to a disposition of the present cause. These questions are:

(1) Is the endowment fund established by Leander Clark and his associates a public charity, such as is perpetuated and administered on proper occasion by courts of equity by application of the cy pres doctrine?

(2) If such endowment fund is a public charity, recognized and protected by the public policy and law of Iowa by application of the cy pres doctrine, as administered by courts of equity, by whom and in what manner is the jurisdiction of such courts to be invoked?

(3) In cases such as the instant one, has a federal court jurisdiction to administer the charity by application of the cy pres doctrine, the charity being located within and subject to the laws of a state?

I take these questions up in the order of their statement. A charity is defined in

the very comprehensive and clear article under the head of Charities in 11 Corpus Juris, page 289, as follows:

"The word 'charity' has a well-known and acknowledged meaning, broad enough to include every gift for a general public use. Indeed, the word has been shortly and tersely defined as a gift to a general public use, which extends to the poor as well as to the rich. A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies of disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. The same definition has been given of a public charity. The word 'charity,' in its widest sense, denotes all the good affections which men ought to bear toward one another, and in that sense it embraces what is generally understood by benevolence, philanthropy, and good will. In its more restricted and common sense, it means relief or alms to the poor. Neither of these meanings are precisely descriptive, however, of the sense in which the courts use the term in applying law relating to charities. In other words, charity in the legal sense is not confined to mere almsgiving, or the relief of poverty and distress, but has a wider signification, which embraces the improvement and promotion of the happiness of man; also, while charity may be benevolence, or any act of kindness or benevolence, all benevolence is not necessarily charity, as the term is a broader one than 'charity.' A charity has been said to be simply an active, express trust; but this definition leaves something to be desired, as it fails to take into account the indefiniteness of beneficiaries, which distinguishes charitable trusts from private trusts."

Professor Pomeroy, in his work on Equity Jurisprudence, third edition, sections 1018 and 1019, at page 1931, describes charitable trusts as follows:

"Sec. 1018. In express private trusts there is not only a certain trustee, who holds the legal estate, but there is a certain specified cestui que trust, clearly identified or made capable of identification by the terms of the instrument creating the trust. It is an essential feature of public or charitable trusts that the beneficiaries are uncertain—a class of persons described in some general language, often fluctuating, changing in their individual numbers, and partaking of a quasi public character. The most patent examples are 'the poor' of a certain district, in a trust of a benevolent nature, or 'the children' of a certain town, in a trust for educational purposes. In such a case it is evident that *all* the beneficiaries can never unite to enforce the trust; for, even if all those in existence at any given time could unite, they could not include nor bind their successors. It is a settled doctrine in England and in many of the American states that personal property and real property, except when prohibited by statutes, may be conveyed or bequeathed in trust, upon charitable uses and purposes, for the benefit of such uncertain classes or portions of the public, and that, if the purposes are charitable, within the meaning given to the term, a court of equity will enforce the trust. Furthermore, it is one of the most important and distinctive features of charitable trusts that, however long the period may be during which they are to last, even though it be absolutely unlimited in its duration, they are not subject to nor controlled by the established doctrines, nor even the statutes which prohibit perpetuities. Indeed, it may be said that the full conception of a charitable trust includes the motion that it is or may be perpetual.

"Sec. 1019. In order that a trust may be charitable, the gift must be for the benefit of such an indefinite *class* of persons that the charity is really a public, and not a mere private, benefaction. On the other hand, in a public trust, the designation of the charitable use and of the beneficiaries must be sufficiently certain and descriptive to indicate the intention of the donor; the language must not be so general and vague as to leave *both the beneficiaries and the purposes and objects* completely to the judgment and choice of the trustee or of the court."

In Russell v. Allen (a case with many features like the instant one) 107 U. S. at page 172, 2 S. Ct. 334 (27 L. Ed. 397) Mr. Justice Gray, speaking for the Supreme Court of the United States, says: "That the gift is for a charitable use cannot be doubted. All gifts for the promotion of education are charitable, in the legal sense."

[2, 3] Generally, upon authority, I entertain no doubt but that the gift of Leander Clark and his associates upon the conditions specified in the Leander Clark proposition,

supra, is a public charity. It embraces every element necessary to meet the requirements of the authorities on that subject. However, as to whether a donation in a particular case is a public charity depends upon the law of the state where created and administered. Wheeler v. Smith et al., 9 How. marginal page 78 (50 U. S. at page 77 et seq.) 13 L. Ed. 44. In the last-cited case the doctrine is laid down that in this country the prerogatives of the crown devolved upon the people of the states; that the state, as a sovereign, is the parens patriæ. In this connection I do not overlook the distinction between the exclusive prerogative of the crown in applying the cy pres rule in England, and administered by courts of equity in the United States. An exhaustive examination of the authorities convinces me that the expression "parens patriæ" is applicable in both instances. In England the chancellor, acting under the sign manual of the king, and executing the prerogative of the king, administered certain charities not recognizable judicially by courts of equity. Such prerogative power has never been granted nor assumed by courts of equity in this country. However, courts of equity in the several states, in pursuance of the public policy and law of such states, do administer public charities of the kind here under consideration, at the instance of the state as parens patriæ; that is to say, it is generally recognized in this country that public charities are ultimately represented in the courts by the state in some form, when the stage has been reached that the particular object of the charity has, or is about to fail.

In considering the instant question, it is therefore pertinent to inquire what the law of Iowa is on the subject, and whether the doctrine of cy pres and its appropriate practice prevails in that state. The principle here discussed is made quite clear by Mr. Justice Bradley, speaking for the Supreme Court of the United States, in the case of Mormon Church v. United States, 136 U. S. 1, at page 58, 10 S. Ct. 792, 808 (34 L. Ed. 481). It is there said:

"The Supreme Judicial Court of Massachusetts well said, in Sohier v. Mass. Gen. Hospital, 3 Cush. 483, 497: 'It is deemed indispensable that there should be a power in the Legislature to authorize a sale of the estates of infants, idiots, insane persons, and persons not known, or not in being, who cannot act for themselves. The best interest of these persons, and justice to other persons, often require that such sales should be made.

It would be attended with incalculable mischiefs, injuries, and losses, if estates, in which persons are interested, who had not capacity to act for themselves, or who cannot be certainly ascertained, or are not in being, could under no circumstances, be sold, and perfect titles effected. But in such cases the Legislature, as parens patriæ, can disentangle and unfetter the estates, by authorizing a sale, taking precaution that the substantial rights of all parties are protected and secured.'

"These remarks in reference to infants, insane persons, and persons not known, or not in being, apply to the beneficiaries of charities, who are often incapable of vindicating their rights, and justly look for protection to the sovereign authority, acting as parens patriæ. They show that this beneficent function has not ceased to exist under the change of government from a monarchy to a republic, but that it now resides in the legislative department, ready to be called into exercise whenever required for the purposes of justice and right, and is as clearly capable of being exercised in cases of charities as in any other cases whatever."

I think the foregoing language makes it clear that courts of equity in this country, in administering public charities, act upon the invocation, directly or indirectly, of the state as parens patriæ—if the charity be localized within a state, at the instance of the state; if the charity be localized within national territory, at the instance of the national government.

[4] In this connection, examination of the case of Lupton v. Leander Clark College, 194 Iowa, 1008, 187 N. W. 496, will be found interesting. From an examination of that case and the cases therein cited, particularly Hodge v. Wellman, 191 Iowa, 877, 179 N. W. 534, and cases there cited, it will appear beyond question that public charities and the cy pres doctrine are recognized and the latter applied in the state of Iowa. While the result of the controversy in Lupton v. Leander Clark College, supra, may not be res adjudicata in the instant case, by reason of the absence of necessary parties and the nature of the suit, it nevertheless, as a legal precedent, is of the highest importance, first, because the status of public charities and the application of the cy pres doctrine is to be governed by the law of the state of Iowa; second, the pronouncement in that case was by the court of last resort of the state of Iowa; third, because the pronouncement was upon and with respect to the identical docu-

ment now under consideration. In that case the late Mr. Justice Arthur, speaking for the court, said:

"We do not agree with the contention of appellants that the sole consideration for the donation was the perpetuation of the name of the donor, by making same a part of the official name of the college. That he was moved to some extent by a desire to establish and perpetuate his name in the community where he had so long resided may be conceded; but this, it seems to us, was clearly not the dominant motive or purpose expressed in the written proposal inspiring his action. By the very terms of said written proposal, the offer was to become void unless the college or its friends raised an additional sum of $100,000. His supreme desire was to secure an adequate endowment for the college.

It appears from the allegations of the petition that $50,000 of the additional $100,000 was donated by Andrew Carnegie, after he had been apprised of the proposed gift of Leander Clark and of the requirement that an additional fund of $100,000 must be raised, or the offer of Leander Clark would not be carried out. As appears from portions of the writing quoted above, the donor commended the success of Western College and the opportunity provided thereby to young men and women for an education, who otherwise might not be able to obtain same, and expressed his appreciation of Christian educational institutions. Surely his dominant purpose was something else than to have his name perpetuated by the college.

"It is elementary that charitable trusts will not be permitted to fail if the intention of the creator of such trusts can be carried out, and effect be given thereto. It seems to us that the provision by Leander Clark that the college should bear his name was a mere incident to a broader and more generous purpose—that of assisting to found and perpetuate a fund, to be so invested and managed as to yield an annual income, to be used for the better education of young men and women who might desire to take advantage of the opportunity offered by the maintenance of such an institution as the college in question.

"It is true that the written proposal of Leander Clark was carefully worded, and was manifestly phrased with the intention of preventing a diversion of the fund to other purposes of the college, or other misapplication thereof. The use of the words 'forever,' 'never,' and other analogous or equivalent words and terms, was doubtless intended to make clear, definite, and positive the purpose of the donor with reference to the investment and management of the endowment fund, and the use to be made of the income therefrom by the trustees and officers of the college, rather than to limit the disposition to be made thereof in the event that the college should, for some reason not within the control of its officers, cease to exist. The language employed must have been used with specific reference to the institution that was to become the immediate beneficiary of his gift. It will be, of course, conceded that he was interested most in having Western College located in his home town, and that he desired it to be perpetually maintained at that place and conducted as an institution; but subsequent conditions made it impossible for the friends of the college to obtain the funds necessary to longer keep it alive. It simply ceased to exist, because it could not continue to carry on its work with the funds available for that purpose. There was no actual or intended breach of the contract by the defendant college or its trustees, nor, as already suggested, was a forfeiture created by the closing of the school, or a resulting reversion of the fund to the estate of the donor.

"There is no apparent reason why this fund may not be invested, upon proper proceeding in a court of equity, and the income derived therefrom applied to the intended purpose of the donor. We need not undertake to define the powers of a court of equity to deal with charitable trusts, nor discuss at length the cy pres doctrine. Where it becomes impracticable or impossible to administer a charitable trust according to its terms, a court of equity will assume jurisdiction thereof, and, in the exercise of its broad general powers, direct the trustees to administer the same, or apply the cy pres doctrine thereto. This doctrine has been adopted by most of the states in the Union (Russell v. Allen, 107 U. S. 163 [2 S. Ct. 327] 27 L. Ed. 397; Peth v. Spear, 63 Wash. 291, 115 P. 164; Richards v. Wilson, 185 Ind. 335, 112 N. E. 780; Dewein v. Hooss, 237 Mo. 23, 139 S. W. 195; Lackland v. Hadley, 260 Mo. 539, 169 S. W. 275; Catron v. Scarritt Collegiate Institute, 264 Mo. 713, 175 S. W. 571; Stearns v. Newport Hospital, 27 R. I. 309, 62 A. 132 [8 Ann. Cas. 1176]; People v. Braucher, 258 Ill. 604, 101 N. E. 944 [47 L. R. A. (N. S.) 1015]; Central Univ. of Ky. v. Walters' Executors, 122 Ky. 65, 90 S. W.

1066; Mason v. Bloomington Library Ass'n, 237 Ill. 442, 86 N. E. 1044 [15 Ann. Cas. 603]; In re Estate of Peabody, 154 Cal. 173, 97 P. 184), and was recently approved by this court (Hodge v. Wellman, 191 Iowa, 877 [179 N. W. 534]).

"It seems to us clear that the dominant purpose of the gift of Leander Clark was to establish a perpetual charitable trust for the aid and support of Christian education. The fact that he may have believed that Leander Clark College would exist forever is without controlling importance. He made no provision for a forfeiture or reversion, but instead used language from which we infer a contrary intention."

In the light of the foregoing pronouncement, I have no doubt as to the proper answer to the first question above stated, and that the endowment fund established by Leander Clark and his associates is a public charity, such as is perpetuated and administered on occasion such as the present by courts of equity by the application of the cy pres doctrine.

[5] The second question: If such endowment fund is a public charity, recognized and protected by the public policy and law of Iowa by application of the cy pres doctrine as administered by courts of equity, by whom and in what manner is the jurisdiction of such courts to be invoked?

A general examination of the authorities convinces me that the public charity which is about to fail is properly represented in a court of equity by the state or some authorized agency of the state. I quote from 11 Corpus Juris, page 368:

"In suits for the enforcement of a public trust or charity, the Attorney General is the proper suitor, and he may file an information, either of his own motion or on the relation of any party concerned; but, when the relator has the chief interest in the suit, the Attorney General, after consenting to the use of the name of the state on his behalf, cannot withdraw and terminate the suit to his prejudice. The Attorney General is a proper, and generally a necessary, party to proceedings affecting the administration or enforcement of a charitable trust. In England the Attorney General must represent all general charities, but his presence is not universally necessary as to specified individual charities, and it has even been held that the Attorney General is not a necessary party to a suit by freemen, on behalf of others, to establish that corporate property was held in trust for them individually."

When the public is the beneficiary of a charitable trust, the Attorney General is the only necessary party to a suit instituted by the trustees in relation to their powers and duties. Usually that officer may come in by intervention, or be brought in by amendment, when necessary; and, in case he should choose so to do, he should be given the right to take charge and control of that portion of the litigation which relates to the public right. While, in case a bill is filed by the trustees of a public charity, seeking directions as to the mode of executing their trust, the Attorney General is a proper party defendant, as representing the public interest, yet that officer is not a necessary party to a bill for the instructions of the court as to the administration of a public charity, when the gift is in the hands of trustees charged specifically by the donor with its management for the cestui que trust, and no charges of waste or mismanagement are made against them."

[6] I find no specific statute of the state of Iowa upon the subject under discussion, but I find that the Legislature of the state (section 148, Code of 1924) at an early date created a department of justice, with the Attorney General as the head thereof, and that (section 149) "it shall be the duty of the Attorney General, except as otherwise provided by law: 1. To prosecute and defend all causes in the supreme court in which the state is a party or interested. 2. To prosecute and defend in any other court or tribunal, all actions and proceedings, civil or criminal, in which the state may be a party or interested, when, in his judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or General Assembly."

Therefore, assuming, as we must assume, that the state is interested in perpetuating this public charity, the state would be interested in any action or proceeding looking to its administration. I think, therefore, in applying the cy pres doctrine in the instant case, the suit should be initiated either by the Attorney General in his official capacity against the college or the trustees thereof, or that the bill filed by the corporation or its trustees should make the Attorney General a party defendant, in order that the public interest may be represented on the record.

[7] As to the third question: In cases such as the instant one, has a federal court jurisdiction to administer the charity by application of the cy pres doctrine, the charity be-

ing located within and subject to the laws of a state?

Neither upon the briefs of counsel, nor as a result of a long and I think thorough independent search of the authorities, have I been able to find an instance where a federal court has ever perpetuated and administered a public charity with its situs within a state by application of the cy pres doctrine. Cases may be found where jurisdiction in such cases has been entertained which arose in the District of Columbia, or in territories subject to national jurisdiction, as instanced in the case of Mormon Church v. United States, 136 U. S. 1, 10 S. Ct. 792, 34 L. Ed. 481. When we stop and consider the very nature of the proceeding, as instituted by the state through its Attorney General, ordinarily there would be no ground of federal jurisdiction. And the same situation would exist with a bill exhibited by the trustee, with the Attorney General as defendant, where such trustee is a citizen of the state in question. Whether a federal court would have jurisdiction of a public charity with situs within a state, that is, created and to be administered within a state for the benefit of the public of such state, where the trustee of the charity is a citizen of another state, I need not now determine. In this case Leander Clark College, the trustee, is an Iowa corporation, and whether appearing as plaintiff or defendant on the record, as against the Attorney General, no diversity of citizenship would exist.

[8] That in the present suit, viewed from the angle of the so-called counterclaim of the defendants, there is defect of parties, I have no doubt. The plaintiff, William E. Schell, is not the trustee of the charity, and certainly, if the subject is a public charity, the Church of the United Brethren in Christ is not the ultimate beneficiary. As I view it, the church occupies merely an advisory relation to the corporation, the immediate trustee. The members of the church have a moral interest in the administration of the charity, so long as it may be administered by the present trustee by any aid or advice which the church may extend. But where an endowment of a college is so limited as to become a public charity in case of failure and inability of the college to administer the charity, the state, the ultimate beneficiary, by its proper prosecuting officer, and through its courts of equity, applying the cy pres rule, will propose the new scheme to admin-

ister the trust, and not the church under the auspices of which the college may have been originally founded or existed. Therefore I think the second plan of consolidation proposed by the board of education, countering the first plan agreed upon by the colleges, was in direct contravention of law. The church was neither the trustee nor the beneficiary of the Leander Clark fund, and upon the failure of Leander Clark's original scheme of administration there was no legal justification for the reversion of that fund to the board of education under any conditions.

[9] But, until the time shall arrive when the jurisdiction of a court of equity is properly invoked to rescue the charity by application of the cy pres doctrine, I think even an instrumentality of the church, or a member thereof, would have sufficient interest to invoke the jurisdiction of a court of competent jurisdiction to prevent unlawful disposition of the fund, the subject of the charity. Now it seems to be well settled that, "in the absence of any scheme judicially approved, the trustees of a charity may not make a cy pres application of the estate on their own authority, even though it is desirable." 11 Corpus Juris, p. 363; Quakertown Lakatong Lodge No. 114 v. Franklin Tp. Bd. of Education, 84 N. J. Eq. 112, 92 A. 870; MacKenzie v. Jersey City Presbytery, 67 N. J. Eq. 652, 61 A. 1027, 3 L. R. A. (N. S.) 227; In re Campden, 18 Ch. D. 310.

I therefore conclude that the plaintiff, not having sustained the allegations of his bill, with the exceptions of such as pertain to the attempted merger with Coe College, is not entitled to the full relief prayed; that he is, however, entitled to a decree that will maintain the status quo of the fund, and prevent any disposal or diminution thereof until the college and its trustees, or the Attorney General of the state, shall proceed in the proper tribunal to obtain judicial approval of either the present scheme for perpetuating and administering the fund, or some other scheme to be devised and approved by a court of competent jurisdiction.

Let this opinion be entered upon the records of the court, and, when so entered, the findings therein to stand as the findings of fact, and the expressions of legal opinion to stand as the conclusions of law of the court, and let decree be entered in conformity with this opinion.